Vol. 7-1249

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Cause No. |
| Plaintiff, | ) | 1:20-cr-0096-TWP-DLP |
| | ) | Indianapolis, Indiana |
| vs. | ) | **February 15, 2022** |
| | ) | 8:34 a.m. |
| CHRISTOPHER TATE (01), | ) | |
| SANDRA KELLOGG (06), | ) | |
| | ) | **VOLUME VII** |
| Defendants. | ) | |

**Before the Honorable**
**TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
JURY TRIAL (REDACTED)


**For Plaintiff:**          Bradley A. Blackington, Esq.
                           Assistant U.S. Attorney
                           United States Attorney's Office
                           Suite 2100
                           10 West Market Street
                           Indianapolis, IN  46204


**For Defendant Tate:**     Kenneth Lawrence Riggins, Esq.
                           1512 Delaware Street
                           Indianapolis, IN  46202


**For Defendant Kellogg:**  Ross G. Thomas, Esq.
                           Attorney at Law
                           1050 North College Avenue
                           Indianapolis, IN  46202


Court Reporter:            David W. Moxley, RMR, CRR, CMRS
                           United States District Court
                           46 East Ohio Street, Room 340
                           Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

Vol. 7-1250

**I N D E X**

Closing argument by Mr. Blackington  .........1263

Closing argument by Mr. Riggins  .............1298

Closing argument by Mr. Thomas  ..............1316

Closing argument by Mr. Blackington  .........1338

 1              (In open court.)

 2         THE COURT:  Okay, we are on the record.  This is the

 3    United States of America versus Christopher Tate and Sandra

 4    Kellogg, and we're present, the lawyers and all counsel.

 5         And, lawyers, at this time the Court is going to deny

 6    the Rule 29 motion for Ms. Kellogg.  And, yes, it was a close

 7    call, but the Court is to review the evidence -- to view the

 8    evidence in the light most favorable to the government.  When

 9    the Court does that, the Court finds that the government has

10    presented sufficient relevant evidence from which the jury

11    could reasonably find Ms. Kellogg guilty beyond a reasonable

12    doubt.

13         The Court reviewed the cases that were cited by both

14    parties last evening.  What distinguishes the evidence

15    presented in this case from those cited by Mr. Thomas is the

16    strong evidence that Tate and Kellogg were selling drugs and

17    were on the same side of sales to a third party.  The Court

18    read that *Lomax* case at 816 F.3d 468, which is a 2016 Seventh

19    Circuit case, and this case discusses that when two individuals

20    sell drugs and are on the same side of a sale to a third party,

21    sufficient evidence a conspiracy exists.

22         And the evidence that the Court considered was the

23    alleged conspiratorial relationship between Tate and Kellogg,

24    that they were on the same side of repeated drug transactions

25    to Mr. Harris.  Kellogg would send Harris over to pick up the

1   methamphetamine and Kellogg contacts Tate to schedule the deal.

2   Tate has Stewart make the deal with Harris, and that puts the

3   three of them on the same side of several transactions with

4   Ms. Kellogg.

5          Also, the relationship between Ms. Kellogg and Dwyatt

6   Harris.  Ms. Kellogg, there's sufficient evidence that she is

7   conspiring with Dwyatt Harris to distribute drugs.  Ms. Kellogg

8   is sending Dwyatt Harris to Indianapolis on several occasions,

9   or having him travel within Indianapolis and transport drugs

10  back to Silver Lake for redistribution.

11         We saw a text message where Ms. Kellogg directed

12  Dwyatt Harris to pick up two or three ounces of meth, and I

13  believe it was two ounces, and bring it back to Silver Lake so

14  that Kellogg could sell it to someone else.  And Kellogg, in

15  that text message, she mentions the name of the customer who's

16  going to get the drugs.  This puts Kellogg directing Harris to

17  pick up drugs, knowing that they're going to redistribute those

18  drugs.  Ms. Kellogg bought 16 ounces of methamphetamine in

19  March, I believe it was either the 15th, and then on the 19th

20  she's only got 11 ounces of meth at the house.

21         There's some evidence that the jury could reach --

22  there's circumstantial evidence to show that Mr. Harris either

23  helped her distribute the methamphetamine or collected the

24  money, because there is a significant amount of money found in

25  Mr. Harris' pockets when he was arrested.  That evidence could

Vol. 7-1253

1    show that Mr. Harris was helping Ms. Kellogg redistribute the

2    methamphetamine in Silver Lake or possibly collecting the

3    money.  And then the transaction puts them on both sides of a

4    transaction.  When you read the *Lomax* case, it talks about when

5    two people sell drugs, are on the same side of a third party,

6    there's sufficient evidence of a conspiracy.

7         So, based on this evidence, the Court is going to deny

8    the Rule 29 motion.  And I admit, lawyers, it was a very close

9    call, and I had to review all these cases last night, but I

10   think that the jury is going to get to make a decision on that

11   count.

12        All right, lawyers, so we need to go through the final

13   instructions, and we don't need the defendants for that.  We're

14   going to go through them ourselves and then we'll put it all on

15   the record.  So we can go meet in the jury room in about two

16   minutes; okay?

17        THE COURTROOM DEPUTY:  All rise.

18     (Recess at 8:42, until 9:07.)

19        THE COURT:  All right, Mr. Tate has arrived, so,

20   lawyers, we're going to go through the final jury instructions.

21   And we're going to go through them at docket 618.  And your

22   copies are being edited, and they will be out shortly.

23        "Instruction on Functions of the Court and Jury,"

24   "Members of the jury," will be given.

25        "The charges against the defendants," will be given as

1    amended to remove Mr. Stewart.

2         "The Presumption of Innocence/Burden of Proof," "Each

3    defendant is presumed innocent," will be given as modified, and

4    we're just going to change the last sentence to say, "He or she

5    is not required to produce any evidence at all."

6         Number four, "You must make your decision based solely

7    on the evidence," will be given.

8         The next instruction, "Considering the Evidence," will

9    be given.

10        "Direct and Circumstantial Evidence," given.

11        "Number of Witnesses," given.

12        "The law does not require any party to call as a

13   witness," will be given.

14        "Defendant's failure to testify," will be given.

15        "Credibility of Witnesses," will be given.

16        "It is proper for an attorney to interview," will be

17   given.

18        "Credibility of a witness," is not given.  That will

19   be removed.

20        "Witnesses Requiring Special Caution," "You've heard

21   testimony from witnesses who were promised a benefit," will be

22   given.

23        "You may consider the evidence that a witness was

24   convicted of a crime," will be given.

25        The "Accomplice Testimony," instruction will be given.

1    "Identification Testimony," will be given.

2    "Voice Identification Testimony," will be given.

3    The opinion instruction will be given as modified.

4    This instruction will say, "You have heard witnesses -- you

5    have heard several witnesses who gave opinions and testimony

6    concerning drug trafficking practices.  You do not have to

7    accept these witnesses' testimony and opinions."

8    The next instruction, "Specific Investigative

9    Techniques Not Required," is withdrawn by the government.

10   The wiretap instruction, given.

11   "Plea Bargaining," instruction given.

12   "English Language Recordings," given, and we'll

13   modify, and the third paragraph will read, "It is up to you to

14   decide whether to listen to a recording during your

15   deliberations."

16   The next instruction, "Foreign Language

17   Recordings/English Transcripts," will be given.  And in the

18   next to last sentence, it will say, "You may not rely on any

19   knowledge you may have of the Spanish language."

20   The next instruction, "Certain summaries were admitted

21   in evidence," is given.

22   Demonstrative Charts Not Received in Evidence."

23   "Certain maps and charts were shown to you to help explain

24   other evidence that was admitted."  These maps and charts were

25   Exhibit 34, and will be given.

1          "Juror Note-Taking" is given.

2          "The second superceding indictment charges that the

3  crime happened 'on or about,'" will be given.

4          "Separation Consideration, One Defendant Charged with

5  Multiple Crimes," will be given.

6          "Multiple Defendants Charged With Same or Multiple

7  Crimes," even though the defendants are not -- are being tried

8  together, will be given.

9          "In deciding your verdict, you should not consider a

10  possible punishment," will be given.

11          The definition of "knowingly" will be given.

12          "A defendant's presence at the scene of a crime," is

13  given.

14          The next instruction is titled 33.  "Count 1 of the

15  second superceding indictment charges defendants Christopher

16  Tate and Sandra Kellogg with a conspiracy to distribute

17  controlled substances."  So we're removing "Jovan Stewart" and

18  "Dwyatt Harris."

19          The definition of "conspiracy" is given.

20          "Membership in Conspiracy," is given.

21          "A conspiracy is a combination of two or more persons

22  to accomplish an unlawful purpose," is given without anyone's

23  objection.

24          Then we're going to add the buyer/seller instruction.

25  "A conspiracy requires more than just a buyer/seller

1    relationship."  That will be given.  That was Mr. Thomas' and

2    Mr. Riggins' tendered instruction.  Mr. Thomas' tendered

3    instruction, "Count 1 charges there was a single conspiracy,"

4    that will be given.

5            The next instruction, "Overt Acts," will be given.

6            We are -- the next instruction, titled number 38, is

7    withdrawn.  "A defendant, with an understanding of the unlawful

8    character of a plan," is withdrawn by the government.

9            The next instruction, "The alleged conspiracy was to

10   distribute controlled substances," is given.

11           The instruction, "Some of the people who may have been

12   involved in these events are not on trial," is given.

13           "If it is established beyond a reasonable doubt," is

14   given without any objection.

15           "You are instructed, as a matter of law, that

16   methamphetamine is a Schedule II," is given.

17           "Distribution of Methamphetamine."  "Counts 2 and 4 of

18   the second superceding indictment charge Christopher Tate with

19   distribution of methamphetamine," is given.

20           The "Definition of Distribution" is given.

21           "Any person who aids in the commission of an offense

22   may be found guilty of that offense," is given.

23           The next instruction, that was number 46, will read,

24   "Count 3 of the second superceding indictment charges Defendant

25   Christopher Tate with" -- we removed "Jovan Stewart" -- "with

1    possession of methamphetamine with intent to distribute.

2    Count 5 of the second superceding indictment charges Defendant

3    Sandra Kellogg."  That will be given as modified, to remove

4    "Jovan Stewart."

5         The next instruction is the "Definition of

6    Possession."  That will be given.

7         "In attempting to determine the intent of any person,"

8    will be given.

9         "If you find the defendant guilty of the offense

10    charged in Count 1," will be given.

11         "When determining the amount of a mixture or substance

12    containing a detectable amount of methamphetamine," will be

13    given.

14         The next instruction, that was 51, will read, "If you

15    find Christopher Tate guilty of the offenses charged in Count 2

16    or Count 3 or Count 4," will be given.

17         What was previously 52 will not be given.

18         What was previously 53 will not be given.

19         54, "If you find Sandra Kellogg guilty of the offense

20    charged in Count 5 of the second superceding indictment," will

21    be given.

22         And then, "Once you are all in the jury room...choose

23    your foreperson," will be given.

24         The instructions to the alternate juror will be given.

25         "Verdict forms have been prepared for you," will be

Vol. 7-1259

1    given.  We'll make sure that that says, "Advise the clerk," and

2    not, "the Marshal."

3         And then the unanimity instruction, that is

4    instruction number 47, will be given.

5         Do you agree, Government?

6         MR. BLACKINGTON:  Yes, Your Honor.

7         THE COURT:  Mr. Riggins?

8         MR. RIGGINS:  Yes, Your Honor.

9         THE COURT:  Mr. Thomas?

10         MR. THOMAS:  Yes, Your Honor.

11         THE COURT:  All right, lawyers.  So we're going to

12    bring in your packets, hopefully they're ready, the full

13    instructions, and also let you look at the verdict forms.  And

14    Tanesa is going to go and check and see if our jurors are all

15    here.  They were supposed to be -- oh, they have a few more

16    minutes.  They weren't supposed to get here until 9:30, and

17    it's 9:23.  So, as soon as our jury arrives, we'll let you know

18    and we'll get started.  So it should be shortly, about 10 or 15

19    minutes.

20         THE COURTROOM DEPUTY:  All rise.

21      (Recess at 9:24, until 10:04.)

22         THE COURT:  We are back on the record, the United

23    States of America versus Christopher Tate and Sandra Kellogg.

24         And, Counsel, before we bring the panel in, they're in

25    the hallway, all lawyers have had an opportunity to review the

1  verdict forms.  Government, do you have any objections to the

2  verdict forms?

3          MR. BLACKINGTON:  No, Your Honor.

4          THE COURT:  Mr. Riggins?

5          MR. RIGGINS:  No, Your Honor.

6          THE COURT:  And Mr. Thomas?

7          MR. THOMAS:  I have no objection to the verdict forms.

8          THE COURT:  Okay.  Is the government ready for the

9  jury?

10          MR. BLACKINGTON:  Yes, Your Honor.

11          THE COURT:  Defendants ready?

12          MR. RIGGINS:  Yes, Your Honor.

13          MR. THOMAS:  Yes, Your Honor.

14          THE COURT:  All right.  You may bring in the panel.

15          THE COURTROOM DEPUTY:  All rise.

16      (Jury in at 10:05.)

17          THE COURT:  We are back on the record.  This is the

18  United States of America versus Christopher Tate.  Mr. Tate

19  appears in person with his attorney, Kenneth Lawrence Riggins.

20  The defendant, Sandra Kellogg, appears in person and by her

21  attorney, Ross G. Thomas.  And on behalf of the United States,

22  Assistant United States Attorney Bradley A. Blackington

23  appears.

24          And ladies and Gentlemen of the Jury, I hope you all

25  had a good evening.  So welcome back to the courthouse.  We are

1    going to do our deliberations today.

2            First of all, you're going to hear the closing

3    arguments of counsel.  And because the government has the

4    burden of proof, they're allowed to go first.  And if

5    Mr. Blackington reserves some of his time, he will also have an

6    opportunity to give final rebuttal comments.

7            So at this time, Mr. Blackington, you may present your

8    closing argument.

9            MR. BLACKINGTON:  Your Honor, we had discussed a

10   couple of days ago about whether we were wearing the masks or

11   not in closing.  Is that -- are we wearing them?

12           THE COURT:  Is everybody comfortable if he removes --

13   raise your hand.  It's just so hard to talk in these masks --

14   and so that they can be more effective.

15           And, Mr. Blackington, all of the lawyers who will be

16   presenting today are fully vaccinated, and I believe they've

17   all had their booster shots.

18           MR. BLACKINGTON:  Yes, Your Honor.

19           MR. THOMAS:  Your Honor, may I address the Court?

20           THE COURT:  Yes.

21       (Bench conference on the record.)

22           MR. THOMAS:  Can you hear me, Your Honor?

23           THE COURT:  Okay, Counsel, you may.

24           MR. THOMAS:  Your Honor, I had mentioned yesterday

25   that while my client did not intend to testify, that I was

Vol. 7-1262

1   going to ask the Court to take judicial notice that Silver Lake

2   was in the Northern District on the record.

3          THE COURT:  Correct.  I need to let both defendants

4   rest on the record, also.  Okay.

5                         (Open court.)

6          THE COURT:  All right.  Before we begin those

7   arguments, the Court does need to allow one more thing to

8   occur.  Mr. Riggins, do you wish to present any evidence on

9   behalf of your client?

10         MR. RIGGINS:  No, Your Honor.  At this time,

11  Christopher Tate rests.

12         THE COURT:  Okay.  And, Mr. Thomas, do you wish to

13  present any evidence on behalf of Ms. Kellogg?

14         MR. THOMAS:  Your Honor, on behalf of Ms. Kellogg, I

15  would request that the Court take judicial notice of the fact

16  that Silver Lake, Indiana, is in the Northern District of

17  Indiana.

18         THE COURT:  The Court will take judicial notice of

19  that fact.

20         MR. THOMAS:  And other than that, Ms. Kellogg rests,

21  Your Honor.

22         THE COURT:  All right.  So both defendants are going

23  to rest on their constitutional rights to not present, and the

24  government, of course, is going to rely on its burden of proof

25  to prove beyond a reasonable doubt.

1    At this time, Mr. Blackington, you may give your

2    closing argument.

3              **CLOSING ARGUMENT BY**:

4    MR. BLACKINGTON:  Thank you, Your Honor.

5    In my opening statement, I spent a lot of time

6    speaking with you about conspiracy and how the drug trafficking

7    business works.  Today I want to start a little bit in reverse

8    order.  I want to talk to you first about Counts 2 through 5

9    and then we'll have a more lengthy discussion about the

10   conspiracy.

11   Count 2 of the indictment charges Christopher Tate

12   with distributing 50 grams of methamphetamine and actual

13   methamphetamine, pure methamphetamine, on December 8th of 2019.

14   You will be instructed by the Court, after all of us give our

15   closing, about what the elements are or the things that we have

16   to prove to prove the offense of distribution, but here's what

17   you'll be told.  You'll be told we need to prove -- the

18   government needs to prove both of the -- the following two

19   elements beyond a reasonable doubt:  One, the defendant

20   knowingly distributed methamphetamine, you transfer it to

21   somebody else; secondly, the defendant knew the substance was

22   or contained some kind of a controlled substance.

23   So in this case, the December 8th delivery by Chris

24   Tate, distribution, was part of the controlled purchase that

25   DEA conducted on December 8th, 2019.  It was the third

controlled buy that you heard happen that DEA executed from the

Mexican gentleman, Jose Rodriguez-Chavez, who was also known as

Jalisco and also known as Johnny.  So the idea is that Chris

Tate gives the methamphetamine to Lacey Guzman, who gives it to

Jalisco, who gives it to the informant.  That's the first

delivery.  And this is the evidence that we have to show that

that delivery occurred.

        If I could display a chart on the screen.  And if we

could have the whole screen, please.

        So on December 7th, the informant, Adela

Marcelino-Cruz, called Jalisco and said she had somebody who,

"wanted one."  Twenty-eight minutes later, Lacey Guzman said

that she was working with someone different, who wanted to

charge more, but that she was still waiting on Chris to call

her back.

        An hour and a half later, Lacey Guzman speaks with

Chris, Chris Tate, and says that he, referring to Johnny, was

in a jam and needed one.  Chris Tate told Lacey Guzman to see

if he still wants it and to call back.  Ms. Guzman then told

Chris Tate that he said we could, "do it tomorrow," do the deal

the next day.  At 7:18 p.m., Jalisco asked Lacey Guzman if

Chris said that, "Tomorrow is fine," and Lacey Guzman said

that, "3:00 tomorrow should be fine."

        Then we move to December 8th, another telephone call.

Jalisco tells the informant that he had things arranged, and

1    Lacey Guzman then tells Jalisco, "3:00 at the office."  Jalisco

2    tells the informant, "The same place as last time."  So that's

3    the ███████████████ address where all three of the

4    controlled buys were done.

5            Then we move ahead to 2:41 p.m.  Lacey Guzman is the

6    first one to show up at the house in her vehicle.  It's a blue

7    Pontiac.  Fifteen minutes after Guzman shows up, Detective

8    Brimer sees Chris Tate, in a white Jeep Wrangler, park across

9    the street from ███████████████ to keep an eye on

10   what's happening there.

11           Two minutes later, a video captures Mr. Tate driving

12   across Massachusetts Avenue to the building.  He parks at the

13   building, he gets out of the Jeep Wrangler, carrying a gray

14   plastic bag, and he goes into Suite C, which is the door on the

15   right end.  After Mr. Tate goes into Suite C, Jalisco gets out

16   of the blue Cadillac that he has and enters Suite C.  So we now

17   have everybody inside Suite C except for the informant, Lacey

18   Guzman, Jalisco, and Chris Tate.

19           One minute later, the informant arrives in her

20   vehicle.  Jalisco comes out of Suite C, gets in the informant's

21   vehicle, and delivers the meth to Tate.  You might remember

22   seeing the bag that she was handed.  It was a plastic bag.  And

23   Jalisco cut it open with a screwdriver to show her the

24   methamphetamine.

25           Jalisco leaves the informant's car.  The informant

drives away with what?  A gray plastic bag containing one pound of methamphetamine.  And you saw the gray plastic bag in the drug exhibit that we showed you and passed around, a gray plastic bag that resembled the one that Chris Tate took out of the Jeep Wrangler and took into Massachusetts Avenue.

Interestingly, a minute after Chris -- after the informant drives away, out comes Chris Tate.  What doesn't he have?  The gray plastic bag that he took in.  We know why, because the gray plastic bag contained a pound of methamphetamine, and he gave it to Lacey Guzman, who gave it to Jalisco, who gave it to the informant, and the meth was now in DEA custody.  The methamphetamine had more than 50 grams of actual, or pure, meth.  We read the stipulation to you in court.  It contained 453.2 grams of actual methamphetamine.

Count 3 of the indictment is a charge of possession of 50 grams or more of actual meth with intent to distribute, and it happened on February 21st of 2020.  You will be instructed about what the elements are of the offense of possession with intent to distribute, and there are three of them:  The defendants knowingly possessed methamphetamine, the defendant intended to distribute the substance to another person, and the defendant knew the substance was some kind of a controlled substance.

That evidence came from the traffic stop that was conducted of Chris Tate, Jovan Stewart, and Tia Dimmett after

the phone calls on February 21st of 2020.  We went through all of those phone calls that led up to the deal.  It started with Darrell Stennis dying and leaving 15 pounds of meth at Tia Dimmett's house.

Who takes possession of the methamphetamine at that point?  Well, at first it's Tia Dimmett.  She gives eight pounds of the meth to Chris Tate and transports the remaining seven pounds to Periwinkle Way, to her grandmother's house.  All the while that this is happening, Chris Tate is telling Danielle Dowling that somebody had, "a couple of them to sell for 2,400," two pounds of meth at the discounted price of $2,400 per pound.

Chris Tate delivers two pounds of meth to Bruce Lyons at Extra Space Storage.  We know about that based on the surveillance that was conducted of him and Mr. Lyons, as well as the testimony of Desirae Evans, that she set up the deal and that after Mr. Lyons was arrested, she went back to the storage facility, found the two pounds of meth, and sold it.

Also on February 21st, at about 2:00, Chris Tate and Twon agree to meet at a church near Periwinkle Way.  Everybody then drives to Periwinkle Way, at which time Chris Tate delivers two pounds of meth to Twon.  And we know that that happens from the video that was Exhibit 461.  We saw Twon go into the building, wearing a hoodie, and he came out, we saw him come out with a big bulge.  One of two things happened in

1    the few minutes:  He got two pounds of meth from Chris Tate and

2    concealed it in his hoodie, or he got pregnant very, very

3    quickly.  Ladies and Gentlemen of the Jury, I'll let you figure

4    out which of those happened.

5           After that, there are five pounds of meth still at

6    Periwinkle Drive.  Chris Tate calls Danielle Dowling and asks

7    for her exact count.  She has $3,000.  Tate, Stewart, and

8    Dimmett return to Periwinkle Way, Dimmett carries the white bag

9    out of Periwinkle Way and gives it to Chris Tate.  He now has

10   possession of it, and he puts it on the floorboard of the front

11   passenger seat of the car.

12          Chris Tate then calls Eric Poore, who tells him he'll

13   have $6,000.  Tate said that D called -- D, or Danielle

14   Dowling -- called for a pound of meth.  So Chris Tate makes

15   plans to meet Eric Poore at ███████████ to deliver meth and to

16   meet Danielle Dowling at the Walmart in Beech Grove.

17          Well, Mr. Tate never made it to either ███████████ or

18   to the Walmart in Beech Grove.  He was stopped by the police

19   with five pounds of methamphetamine in his possession on the

20   floorboard underneath his feet in the front passenger

21   compartment of the car, five pounds of meth that he intended to

22   distribute specifically to Eric Poore and Danielle Dowling.

23   The methamphetamine tested positive, as the lab results show,

24   and there's well over 50 grams of actual methamphetamine.

25   There's almost 2,000 grams of actual methamphetamine.

1    Let's then turn to Counts 4 and 5.  Counts 4 and 5 are

2    the delivery of methamphetamine from Chris Tate to Sandra

3    Kellogg that happened on March 15th of 2020, about four days

4    before Ms. Kellogg was arrested.  So the delivery from Tate to

5    Kellogg happened in the city of Indianapolis on the 15th of

6    March, and Kellogg took possession of the pound of

7    methamphetamine in Indianapolis on March 15th.  Count 4 is Tate

8    delivering it to Kellogg, distributing it to Kellogg.  Count 5

9    is Kellogg taking possession of it with intent to distribute.

10    And if we look at the text messages that set up the

11    deal, they were Exhibit 630, and there were a very long list of

12    text messages.  They started with a phone call between Kellogg

13    and Tate.  And then in the fourth text message Tate says,

14    "Three flat."  So he's going to charge her $3,000 for the pound

15    of meth.  And Kellogg asked if he'll take 2,800.  No, it's got

16    to be $3,000; okay?

17    On line 8, Kellogg says, "I'm trying to get it all and

18    I'm on my way that way."  Tate sends an address of 3725 North

19    Keystone Avenue, which is where they initially planned to meet

20    to do the deal.  And it's a -- it's a Family Dollar or Dollar

21    General Store.  I think it's a Dollar General Store in

22    Indianapolis.  Kellogg acknowledges the address, and then they

23    continue to communicate on the phone.  On line 20, text message

24    number 20, at 6:42 in the evening, Tate reminds Sandra Kellogg

25    to call when she was 30 minutes away.

1        And let's go to the next page.

2        Okay, they continue to talk, and on line 27, at

3 Kellogg's request, Tate provides her with the address again.

4 She tells him, "10 minutes away and about to pull up," and

5 that she's here.  Okay.  She doesn't meet Chris Tate there.

6 She meets someone else, who's a drug runner for Chris Tate.

7        And you will receive an instruction called the aiding

8 and abetting instruction.  What the aiding and abetting

9 instruction means is, if somebody else helps somebody to commit

10 a crime, aids them in committing a crime, they're on the hook

11 for the crime.  So, by setting up this drug deal and giving it

12 to the -- the pound of meth to the person who brought it to

13 Sandra Kellogg, Chris Tate aided and abetted that person,

14 helped them commit the crime, and he's on the hook for the

15 pound of meth that was delivered.

16        We saw from the cellular site records, also, that the

17 phones from Sandra Kellogg and Dwyatt Harris were in the same

18 area, at the Dollar General Store, at the time that this

19 meeting happened, which further proves they were there.  And

20 line 34, Tate acknowledged, "Got.  Love you, good looking."

21 She got the pound of meth.  Tate says, "No problem."  And just

22 to make sure, in the last text message Sandra Kellogg tells

23 someone else, "Hey, I just passed through Indy, had to come

24 pick up."  It tells exactly what she was doing in Indianapolis,

25 picking up the pound of methamphetamine.

1    Ms. Kellogg is later arrested, four days later, in the
2    early morning of March 19th at her house in Silver Lake,
3    Indiana.  Eleven ounces of the 16 that she bought from Chris
4    Tate on the 15th are found there.  The lab results discuss the
5    purity of the meth.  One of the samples, there's 190 grams of
6    actual methamphetamine.  The other, 117.3 grams.  So, again,
7    we're well over 50 grams of actual meth.

8    And after she's arrested, Kellogg gives not one, but
9    two confessions.  The first one is to a DEA agent, Agent
10   Schneider in Fort Wayne, where she admits that there was meth
11   in her house, as well as a gun.  And then there's a longer
12   conversation, a longer confession she gives to Agent Holbrook,
13   where she admitted that the 11 ounces of meth at her house were
14   what was left from the 16 ounces, or the pound, that she got
15   from her source in Indianapolis.

16   And we know who that was from looking at the text
17   messages.  It was Chris Tate.  The text messages with Chris
18   Tate were to three different cellular phones.  All three of
19   those cellular phones were found in Chris Tate's house when it
20   was searched by DEA several days later.

21   So that evidence shows, number one, that Chris Tate
22   aided and abetted somebody in delivering the pound of meth to
23   Kellogg, and that Kellogg took possession of that pound of
24   methamphetamine in Indianapolis.

25   Now, how do we know that she intended to distribute it

1   to somebody else?  Well, the first thing we know is when the

2   drugs were found, a large amount of meth; right?  A pound of

3   meth, 28.3 grams in an ounce, about 435 grams in a pound, and

4   we know that a dosage unit for the typical user in a day is a

5   gram.  And that's a pretty high dosage unit for someone, so

6   that's a lot of meth.  And the weight of the meth itself shows

7   that it's possessed with intent to distribute.

8        But how else do we know?  We know because it was

9   bagged into ounce quantities for distribution.  If somebody is

10  just going to use the pound of meth, why rebag it into separate

11  bags with ounces?  The reason you do that is you have customers

12  coming to buy ounces of meth, so you want to weigh it and

13  package it so you can sell it to the customers.  So the fact

14  that the bags are in ounce quantities is very important to the

15  case.

16       But what else do we have?  A large amount of the meth

17  is found in a shoebox in her bedroom.  It's found with digital

18  scales, which you've heard testimony, dealers use to weigh meth

19  for distribution, and it's found in her bedroom with other

20  sandwich Baggies.  And why would you have sandwich Baggies in

21  your bedroom with meth and digital scales?  To distribute the

22  meth.  If you're just going to use it yourself, you're going to

23  take it in the package that Chris Tate gave it to you in.

24  You're not going to have to rebag it into other sandwich

25  Baggies.  But the presence of those sandwich Baggies in her

bedroom, with the digital scales and the drugs, shows ongoing

drug trafficking and the intent to distribute it.

On top of that, what else do we have?  We have $375

that are found in Dwyatt Harris' pants pocket on the bed.

Where did that money come from?  Well, we know that there's

five ounces of meth that's missing from what she got

originally.  Ladies and Gentlemen of the Jury, where do you

think that $375 came from?  Dwyatt Harris selling one of those

ounces of meth for Ms. Kellogg and collecting the money.

Let's move, then, to the conspiracy count.  And in the

opening statement I gave, and I think you all saw this as it

evolved, we talked about drug trafficking being a business, and

I talked about it like Krispy Kreme doughnuts, that the

doughnuts are made in North Carolina, they're sent to

Indianapolis by truck.  They arrive at a wholesale location.

And then, from the wholesale location, the doughnuts are given

to retail distributors, who then sell them to the customers.

And all of the people who work for the Krispy Kreme doughnut

business, from the CEO to the people selling them in the retail

stores, are part of an agreement to sell doughnuts.

I talked to you about how a drug trafficking business

was similar to Krispy Kreme in many ways.  There's a hierarchy,

there's an organization, there's a structure to the drug

trafficking business.  It's also a business that's driven by

profits, and it operates in the same way.  We focused in this

1    drug business on the wholesale seller, Christopher Tate, and

2    many of his retail distributors, who included Sandra Kellogg.

3    The drugs come to Indianapolis.  Someone like Mr. Tate gets

4    them, distributes them to the retail dealers, who sell them on

5    the streets.

6         But we also talked about how a drug trafficking

7    business is different from the doughnut business.  Drugs, as

8    you've seen, methamphetamine and heroin, create awful results

9    on society.  You heard about this a little bit, about meth

10   addicts who stay up for several days without sleep.

11        But the fact that the drug dealing business is illegal

12   causes the evidence to look differently than it would for a

13   legitimate business like Krispy Kreme.  We talked about how

14   drug dealing -- people who deal drugs are criminals.  So the

15   government witnesses who testify, and that you would hear

16   describe how this organization worked, had their own type of

17   resumé, and it's a resumé different than someone who works for

18   Krispy Kreme doughnuts.  It's called a criminal record.

19        We also heard, the fact that drug trafficking is

20   illegal means that it occurs in secret.  All of the drug

21   trafficking activity happens in secret.  There are no written

22   contracts like you would have for selling doughnuts.  We prove

23   how the agreement works by the actions of the members of the

24   conspiracy.

25        There aren't signs in the business advertising meth or

heroin for sale.  The drug dealers simply blend into the
community.  And when they talk on the phone, they speak in
code.  They don't say, "Hey, I've got a pound of meth for
sale."  You've seen how all of that developed in this case.

Also, the fact that drug dealing is illegal means that
it's an insular business.  We talked about how it's
compartmentalized, especially when you get into upper level
dealers like Chris Tate and significant wholesale dealers like
Sandra Kellogg.  People who are involved in drug dealing want
as few people to know about what they're doing as possible.
Why?  They don't want witnesses to come into court to testify
about them.

So they have this compartmentalized business model
where members of each link in the drug distribution chain try
to exist in their own little compartment and carry out their
dealings isolated and separate from other people.  The result
is that there's nobody who can testify about how the entire
business works, because they keep contacts to a minimum.

That's why people like Danielle Dowling, Desirae
Evans, and Sandra Kellogg don't know about each other and their
activities, because Chris Tate wants to deal with them
separately so they don't know who each other are, and there are
few -- there isn't a witness to how the whole operation works.

We talked about the drug trafficking business not
being a business agreement, but it's called a conspiracy.  And

1    when you are instructed on conspiracy, the instruction will

2    discuss that there are two elements of the offense:  One, the

3    conspiracy that's charged in Count 1 existed; and, secondly,

4    that a defendant knowingly became a member of the conspiracy

5    with the intent to advance it.  So, again, a conspiracy is an

6    agreement to commit a crime, and each defendant joins into the

7    agreement with the intention to advance it or further it or

8    help it along.

9        This agreement in this case, the conspiracy, was an

10   agreement between Chris Tate, Jovan Stewart, and many other

11   people to distribute controlled substances in Indianapolis,

12   both meth and heroin.  Chris Tate was the primary member of the

13   conspiracy.  He's the source of supply for the drugs.

14       Jovan Stewart was a drug runner for Chris Tate, Sandra

15   Kellogg sold methamphetamine for Chris Tate, and Dwyatt Harris

16   was a drug runner who also, based on the money that was found

17   in his pockets on the day of his arrest, you can also infer was

18   a dealer for Sandra Kellogg.

19       Let's talk about the evidence, as to how each

20   defendant participated and joined the conspiracy.  We talked

21   about different sources of evidence in the beginning, wiretaps,

22   physical surveillance, statements of accomplices, seizures,

23   cellular site records.  Let's look at how all of this played

24   out.

25       The first source of evidence I want to focus on and

weave some of these other things in are the wiretaps.  And in their own words, the defendants in this case told you how the conspiracy worked, how they joined the conspiracy, and how they advanced it.  I want to focus specifically -- you heard about a lot of transactions with Chris Tate.  I want to look at four of them.

The first one is the delivery of eight ounces of meth from Jovan Stewart to Danielle Dowling at the America's Best Value Inn on December 19th, 2019.  Chris Tate sent Stewart to deliver eight ounces of meth to Dowling at that location.

And let's pull up the chart that I prepared first, and there's also a surveillance chart, which was introduced as Exhibit 404, if we could put them side by side.

Okay.  So looking at the chart on the left, this is kicked off on December 19, when Tate tells Danielle Dowling that he's going on a plane at night and he wants to, pardon the French, "Get some shit and leave with my cousin."  He asks Dowling, "What do you think you're needing?"  Danielle Dowling said she's going to use about -- need about three or two pounds of meth.

And Dowling tells him exactly what she's going to do with the meth.  She's going to distribute it to her customers.  One of her customers, Capone, took some meth to Brownsburg and to her Shelbyville people last night.  Danielle Dowling talked about how she had to sell some things to her Chicago people.

So there's an agreement here between Tate and Dowling where
Tate is going to give Dowling the meth and she's going to
distribute it to her customers, and it's eventually going to go
to her customers' customers.

Dowling says, "I need to get around to everybody,"
that's for sure, all of her customers.  And Chris Tate really
wants to help her get the meth to the customers.  He says," If
I wasn't at work, man, I swear to God, just take one and we
could just ride to all of them people."  But Chris Tate has to
get on an airplane that night, so Danielle Dowling talks, then,
about the amount of meth her customers will need.

We get to 5:04 at night, and Chris Tate tells Dowling
again he's leaving at 8:00 and is going to leave some for cuz,
for Jovan Stewart, to deliver to Dowling.  So the drugs are
going to go from Tate to Stewart to Dowling.  And Dowling
specifies who her customers are that he needs to get the meth
to, Ogre, Ryan Sawyers, Hollywood, Eric Poore, and Big Head.

Going an hour later, Dowling tells Tate, "I need eight
ounces of meth."  Tate tells her to call when she gets the
money and they'll meet somewhere.  Dowling says, "The money is
at the Waffle House," right there in that same parking lot.
Ryan Sawyers, also known as Ogre, was staying at the America's
Best Value Inn, and he had had the money to pay for the drugs.
He was going to get them eventually.

Fast-forward to 7:18.  Dowling tells Tate she was 15

minutes away, Tate tells Dowling that Jovan Stewart is eight

minutes away, and Tate specifically asked Dowling about the

black Jeep.

Rolling over to the surveillance chart, we see that

the last call was at 1943, at 7:43 at night.  The black Jeep is

there.  We look at the surveillance chart, and we know, from

the surveillance, that Jovan Stewart drove from Willow Bend

Drive, parked at the America's Best Value Inn, where Dowling's

white Solara was, and then drove away a minute later.  And then

Danielle Dowling drove away.  So Dowling testified that they

met and completed the eight-ounce transaction.

The second one I want to talk about is three days

later.  On December 22nd, Chris Tate sent Jovan Stewart to

deliver 22 ounces of methamphetamine to Dowling at a Kentucky

Fried Chicken restaurant.

And if we have those two charts, please, side by side.

Looking on the left is the first chart that summarizes

the phone calls.  Dowling is calling Tate, who's out of town,

and says, "One person asked me for 20 zips," 20 ounces of meth.

Tate then says, "I can get you 20 of them in a four, too."

Dowling says, "The ones I got last night were really good."

And Tate says, "There's like ten whole ones left from that."

So Tate's source has ten pounds of methamphetamine

that are similar in quality to the ones that Danielle Dowling

got the previous night and left.  She changes her order an hour

1    later and asks for 22 ounces of meth, and Tate says he'll have

2    cuz meet his brother on the south side.  So cuz is going to go

3    to the meth source to get the 22 ounces.

4         Five minutes later, Tate tells Dowling to wait 15

5    minutes and then to go to the KFC on South Emerson.  Dowling

6    changes her order again to 27.  Tate says, "I can't do 27, but

7    I can have them come back and bring five later."  And Dowling

8    says, "I'll just wait till I collect everyone's money at the

9    KFC."  So that's at 3:08.

10        What do we see happening at the KFC?  At the -- at

11   4:19 p.m., the Spotless Car Wash, which is next door, we see

12   Jovan Stewart's black Jeep and Sawyers' silver Saturn there.

13   Danielle Dowling pulls up and meets with Sawyers and drives

14   over to the KFC restaurant, where Jovan Stewart has moved to,

15   as well.

16        Dowling, at 4:27, gets out of her Solara, enters the

17   Jeep Liberty, and she's holding a plastic bag that you could

18   see, that contained meth, inside of the Jeep Liberty.  She then

19   gets out of the Jeep Liberty, goes back into her Solara, meets

20   with Ryan Sawyers, and they drive away.  Danielle Dowling says

21   that they drove away to a hotel room, which is where she gave

22   the 20 ounces of meth to Sawyers.

23        Again, this is how the conspiracy worked.  Tate gives

24   the meth to Stewart with the agreement that he'll give it to

25   Dowling.  Stewart then gives it to Dowling.  Dowling gives it

1    to her customers.

2          The third deal I want to talk about is on

3    February 7th of 2020 at ███████████████████ in Indianapolis,

4    and that's when Chris Tate delivered a pound of meth and an

5    ounce of heroin to Eric Poore.  And we get some insight in this

6    buy as to who Chris Tate got the drugs from.

7          At 12:31, Tate tells Poore that he could get the red

8    ones that Poore had been getting for 27.  So the type of meth

9    that Poore had been getting, he was selling for $2,700 a pound.

10   Tate offered to bring it to Poore, and he said he would be

11   there within an hour, and again pardon the language, "because I

12   got to go get the shit."

13         At 12:33, Tate asks Poore if he also wanted a single

14   of the old man, an ounce of heroin.  Poore says, "Yeah, come

15   with it."  Tate asks how long it would be, because last time it

16   took ten days.  He fronted the heroin to Poore, and Poore took

17   ten days to pay him.  Poore said it wouldn't take that long.

18         So then we look at the surveillance chart.  11 minutes

19   later, a surveillance officer sees Tate go into ██████████

20   ██████████████, which is where Darrell Stennis lives with Tia

21   Dimmett and keeps his drugs.  About a half-hour later, Tate

22   arrives at Stone Mill Drive in a black Ford -- his black Ford

23   Fusion.  He gets out of the Fusion, he goes into Stone Mill

24   Drive.  10 minutes later he comes out, reenters his Fusion,

25   and drives away; okay?  So we see Chris Tate on the video

1    taking the meth and the heroin into Stone Mill Drive and coming

2    out.

3         The fourth chart that I want to look at is a deal on

4    February 17th at Chuck's Market, and it again involves

5    Mr. Stennis and Mr. Tate.  This time they're delivering a pound

6    of meth to Danielle Dowling.

7         At 1:16 in the afternoon, Dowling asks Tate, "Is there

8    any way I can see you?"  And Tate says, "At 3:00."  Tate says,

9    "I'll just have him drop it off at my job and then at 2:50 just

10   go to Chuck's Market."  So the source is going to drop off the

11   meth and then Tate will meet Dowling at 2:50.

12        Dowling is texting, then, one of her meth customers,

13   James Unger, and says, "I have to meet my guy at 3:00 to get

14   more," more meth, and will come straight there to meet Unger.

15   Dowling, at 3:13 in the afternoon, calls Chris Tate.  She's

16   running a little bit behind, and says she'll be there in three

17   to four minutes.

18        We then swing over to the surveillance chart, and at

19   3:15, after that phone call, Tate drives away in his black Ford

20   Fusion from his workplace.  Four minutes later, Dowling is at

21   Chuck's Market, and Dowling gets out of her car and gets into

22   Tate's black Fusion.  So we have Tate and Dowling in the car.

23        Who arrives four minutes later?  Darrell Stennis,

24   driving his dark blue Impala, leaves Elizabeth Street and at

25   3:27 p.m. arrives at Chuck's Market.  Chris Tate goes from his

1   black Ford Fusion into Stennis' blue Impala, and he comes out

2   carrying a bag and gets back in the Fusion.  Dowling, still in

3   the Fusion, leaves the Fusion carrying something under her arm.

4   She gets back in the black Saturn, and everyone drives away.

5        Danielle Dowling testified about what she got inside

6   of the black Fusion, that it was a pound of methamphetamine.

7   So here's how the agreement works, Stennis giving the drugs to

8   Tate to give to Dowling to resell.

9        I also want to talk now about how the wiretap showed

10  two transactions that involve Sandra Kellogg.  The first one

11  is a deal on January 15th of 2020, when Aaron Brown delivered

12  an ounce of meth to Ms. Kellogg at a CVS store.

13       So let's pull up Government's Exhibit -- or pull up

14  the chart, please.  And if you could put the surveillance

15  chart, Exhibit 418, beside it.

16       So on January 15, Kellogg calls Tate and says, "I'm

17  going to hit you because I need two."  At first she orders two

18  ounces of meth.  She tells Tate she'll be there tomorrow,

19  she'll be in Indianapolis around 2:00 or 3:00 in the afternoon.

20  Tate tells Kellogg, "I'll probably have you run into Peso."

21  Okay?

22       So, that -- that transaction happens on the 15th --

23  I'm sorry.  I have these wrong on the chart.  When you look at

24  the third entry on down, it should say January 16th.  I made

25  these up last night in haste.

1    On January 16th, at 11:54, Kellogg tells Tate she'll

2    be in Indy at around 2:00 or 3:00.  Later on the 16th, Tate

3    says, "I'll probably have you run into Peso."  An hour later,

4    Kellogg changes her order.  She goes from two ounces of

5    methamphetamine to one.  Tate tells Kellogg to head to the

6    Burger King on 38th and Illinois and call when she's 10

7    minutes away.

8        At 5:42 in the afternoon, Kellogg tells Tate she's 10

9    minutes away and is in a blue Chevrolet Impala.  That's the

10   same blue Chevrolet Impala that Dwyatt Harris has driven to

11   collect drugs for Kellogg on several indications.

12       Seven minutes later, Kellogg tells Tate she's going to

13   go across the street from the CVS.  Why?  Because the police

14   have someone pulled over right here at this Burger King.  After

15   all, who wants to do a drug deal in front of the police; right?

16   Not the best idea in the world.  Five minutes later, Tate tells

17   Kellogg that she -- he directed the customer -- or the runner

18   to go to the Subway.  Kellogg asks if it's Peso.  Tate says,

19   "No, it's cuz."

20       So then we slide over to the surveillance chart.  And

21   what do we see going on during this -- these conversations?  We

22   see the blue Impala arrive at Burger King, drive across the

23   street to the CVS, where we see Kellogg step outside of the

24   vehicle.  And she's identified as the passenger of the blue

25   Impala.  We saw that in the videos.

1    Harris then drives the blue Impala from the CVS to the

2    Subway restaurant.  A gray Chrysler 300 arrives, Aaron Brown

3    gets out of it, goes inside of the Impala and meets with Sandra

4    Kellogg.  The blue Impala drives away and Brown goes back into

5    the Subway.  We later are able to identify Dwyatt Harris as the

6    driver of the car when he's pumping gas into the blue Impala at

7    a gas station; okay?

8    After the deal happens, so Aaron Brown gets out of the

9    Impala at 6:05.  At 6:05, Kellogg asks Tate, "Was that the

10   person?  I left my phone in the car."  Okay, that's an

11   interesting text message, because this deal on January 15th is

12   the first time that DEA has seen Aaron Brown doing any drug

13   transaction with Kellogg.

14   Why would Sandra Kellogg have seen Aaron Brown before?

15   Are they social friends?  Is there any evidence whatsoever that

16   she and Chris Tate are social friends, that they get together?

17   No.  The evidence suggests they're all drug dealers.  And the

18   reasonable inference from this is that she has -- before the

19   wiretaps started in December, she's done other deals with Chris

20   Tate, with other drug runners, including Aaron Brown.

21   And that's also supported by the fact that on

22   December 18th, 2019, during the first deal that Kellogg does,

23   they talk about the Kellogg dude in dreads arriving and they're

24   looking out for a white Mercedes; okay?  No, no, no, it's a

25   blue Impala.  Well, that's because, I suggest to you, during an

earlier deal Mr. Harris had driven his white Mercedes to get the drugs for Ms. Kellogg, and now they're confused because it's a blue Impala, and that's the car he drove.

So, Ladies and Gentlemen of the Jury, the evidence suggests that this dealing between Mr. Kellogg and -- Ms. Kellogg and Mr. Tate started well before December 18th, and it was ongoing drug activity.

The next thing I want to look at on this January 15 deal are some of the text messages that were found in Exhibit 625, which is Ms. Kellogg's cellular phone, and she's texting back and forth with somebody named J. So after the drugs are picked up on the 15th -- they're picked up at 6:05; okay? Before the deals are picking up, on line 3, J is saying he or she wants to, "swing by for lunch or dinner ASAP, a whole meal." And Agent Holbrook gave his opinion that the "whole meal" was an ounce of meth; okay?

And then J says, well, "ASAP," meaning whenever, tomorrow or whenever. Kellogg then says, "I'll try to do it today, but tomorrow for sure. I will get it to you as soon as it's in my hand." That's a suggestion that there's more than lunch or dinner. What do you mean, the lunch or dinner is in your hand? No. It's an ounce of meth. It's the whole meal.

We continue through the 15th. And then at 5:31 p.m., she tells J, "I'm going to grab it tomorrow. Is that cool?" And then later on, at 5:47, Kellogg asks J, "What time are you

coming tomorrow?"  J says, "Right after work, at about 5:30 or

6:00."

And then we continue to the following day.  J asks,

"Are you still on for today?"  Kellogg says, "Yes.  I'm on my

way now."  So this evidence shows that the ounce of meth that

Aaron Brown gave to Kellogg was transported together by Kellogg

and Dwyatt Harris back to Silver Lake, Indiana, where she would

deliver the methamphetamine, the ounce of meth, to J.  The

cellular site records, which were admitted as Exhibit 645, back

up that that's the path of travel that occurred.  They show

Kellogg and J together in the early morning and returning and

driving back to Silver Lake, Indiana.

The next deal that I want to talk about is on

February 6th of 2020.

Let's pull that one up.

Okay.  And on February 6th of 2020, this is a deal

where Chris Tate had a drug runner deliver an ounce of meth to

Ms. Kellogg at the Country Club Apartments.  On the 6th, at

4:25 in the morning, Kellogg texts Tate and says, "I'm going to

need you again."  Kellogg then asks where she's going and Tate

says, "The Country Club Apartments at Mason and Troy."

At 6:03, Tate directs Kellogg to go to the office over

there.  And at 6:22, Kellogg tells Tate, "I'm driving right by

the office."  I'm not going to put it on the screen, but you

saw the cell site records for Sandra Kellogg's phone, that she

1    was within a half a mile of the Country Club Apartments at the

2    time that call happened.  So, Kellogg meets the source, meets

3    Tate's drug runner at the Country Club Apartments around 6:22.

4    And then at 7:17, Kellogg thanks Tate for getting the drugs.

5    "Thank you, bro.  See you next time."  So, what is Ms. Kellogg

6    going to do?  She's going to sell the drugs, collect the money,

7    and get money to buy more meth from Chris Tate next time.

8         Now, Kellogg complains a little bit about the meth.

9    She says, "Let bro know it was a couple off," a couple of grams

10   under 28.35 grams, "but I'm not tripping.  Just for the next

11   time."  So the next time she gets drugs from Tate, she wants to

12   get a full ounce of meth.  She doesn't want to get shorted

13   again.  But Kellogg says it looks better than the one from

14   earlier, it looks better than the ounce she got last time.

15   Tate says, "Okay, be safe."

16        So then we go to Exhibit 626 and we look at text

17   messages between Sandra Kellogg, Dwyatt Harris, and someone

18   named Trish the next day.  And they indicate what Sandra

19   Kellogg was doing with the meth, specifically what she and

20   Dwyatt Harris had agreed to do with the meth, what they

21   conspired to do with the meth that they got from Indianapolis.

22        So when you look at these text messages, on text

23   message seven Trish tells Sandra Kellogg that she needs, "the

24   same."  Kellogg doesn't understand.  Trish says, "Two ounces."

25   Who does Kellogg call?  Dwyatt Harris.  "Hey, Trish called,

*CLOSING ARGUMENT / BLACKINGTON*     Vol. 7-1289

they need two, so they're coming for them.  So maybe bring

three just in case."  Trish talks to Kellogg on the 7th and

says in the, "morning?"  And then Kellogg tells Harris, "All

right."  And they talk about Trish not wanting to come late and

go through Porter County after a certain time, so they're going

to do the deal on the next day.

     If we could pull up Exhibit 6 -- I'm sorry,

Exhibit 646 and maybe put it on the left-hand side.

     We see Dwyatt Harris' pattern of travel, as well as

Ms. Kellogg.  On the 6th, Ms. Kellogg is down in Indianapolis,

she's picking up the first ounce of meth at Country Club Drive,

and she returns to -- the Country Club Apartments, and she

returns to northern Indiana that night.

     On the 7th, in the afternoon, she's in Silver Lake.

Where is Dwyatt Harris at 11:40?  He's in Indianapolis.  Then

he shows up in Silver Lake at 8:42.  And, incidentally, after

that, Trish consummates the next deal with Sandra Kellogg for

the two ounces of meth.  So this is the agreement between

Kellogg and Harris to deal the meth that they're getting from

Chris Tate.

     The next source of evidence I want to speak about are

the accomplices.

     And we can clear the screen.  Thanks.

     The first accomplice testimony is Danielle Dowling.

Danielle Dowling testified that from the summer or fall of 2019

1   until February 21st of 2020, when Tate was arrested, she got

2   one to two pounds of methamphetamine per day from Chris Tate.

3   She also got heroin infrequently.  On one occasion, you heard

4   the phone calls, and she was fronted two ounces of heroin.

5   That's probably the largest deal they did.

6        These methamphetamine deals between Tate and Dowling

7   followed a regular pattern.  The agreement unwound in a regular

8   pattern.  Dowling called Tate on the phone to order the meth,

9   she would then meet Tate and Jovan Stewart at different

10  locations, Stewart often drove Tate, and Tate would deliver the

11  meth from her.  This was an ongoing, long-term drug dealing

12  relationship.  It was not just a series of isolated deals.

13       Chris Tate needed Danielle Dowling to sell the meth

14  and make money.  We talked on one hand about how fronting

15  supports a conspiracy.  Fronting supports a conspiracy because

16  drug dealer one gives the money for free to drug dealer two.

17  Drug dealer two sells the drugs and then pays drug dealer one

18  the money for the sale.  A conspiracy exists because drug

19  dealer one is depending on drug dealer two to sell the meth to

20  get paid.

21       Despite the fact that this is not a fronting

22  relationship, the same dependence exists, and it exists in this

23  way:  Every day for many months, Tate is selling Dowling one or

24  two pounds -- one to two pounds of meth a day.  What does

25  Danielle have to do after she buys a pound to get more drugs

1    from Chris Tate?  She has to sell the pound of meth that she

2    bought.  She sells the pound of meth that she bought, she

3    collects the money, and Chris Tate sells her another pound of

4    meth.  Chris Tate doesn't get to sell her the other pound of

5    meth unless Danielle Dowling has sold the previous pound of

6    meth.  So, just like the fronting relationship, Chris Tate

7    depends on Danielle Dowling to sell the meth that she's getting

8    from him.

9         Desirae Evans is the next accomplice I want to talk

10   about.  She testified that she got a pound of meth from Chris

11   Tate on about ten different occasions.  The first five times,

12   it came through Lacey Guzman, and those five deals included the

13   pound of meth that she got at ███████████████████ when --

14   on the same day that Jalisco delivered a pound of meth to the

15   DEA informant, Adela Marcelino-Cruz.  We heard testimony about

16   that deal from both Marcelino-Cruz and Desirae Evans, and it

17   happened on November 21st of 2019.

18        After Lacey Guzman was unreliable, Desirae Evans dealt

19   directly with Chris Tate about five times.  The first three

20   deals were a pound of meth.  Then there was a smaller fentanyl

21   deal.  And then the two pounds of meth happened early on

22   February 21st, where Desirae sent Bruce to get the meth, and

23   Bruce got the two pounds, left it in the storage unit, and was

24   then stopped by the police.  She also talked about how she and

25   Chris Tate used FaceTime to try to avoid detection from law

1  enforcement.

2      The third accomplice witness was Tia Dimmett.  She was

3  the girlfriend of Darrell Stennis.  She talked -- she dated

4  Mr. Stennis through January and up until February 2020, and she

5  said that Stennis brought 20 to 25 bricks, that were wrapped in

6  duct tape, into her house on several occasions from

7  January 2020 until his death on February 20th of 2020.  She

8  testified that during those couple of months, she saw Darrell

9  Stennis deliver one or two bricks to Chris Tate about ten

10  times.  About half of the time, the deals happened at Chuck's

11  Market.  About half of the time, Chris Tate came to her house

12  at ███████████████████████.

13      She also saw Mr. Stennis, after the deals happen,

14  collect money from Chris Tate.  She described the four-inch wad

15  of money that had 20s and 50s in it and was banded together.

16  And there was no drug deal when the money was paid, so this

17  implied that Stennis fronted the meth to Chris Tate.

18      She also described the events of February 21st of

19  2020, that Mr. Stennis died the day before and left 15 of those

20  bricks remaining at her house in a pillowcase.  Who did she

21  call to help move the bricks?  The person that she had seen

22  before getting the bricks from Darrell Stennis.  She called

23  Chris Tate.

24      Chris Tate agreed to help.  It's a chance to get

25  money.  He shows up at first and gets eight of the 15 bricks.

1   Tia Dimmett takes the other seven bricks to her grandmother's

2   house.  Chris Tate returns after getting the eight bricks and

3   gives Tia Dimmett $10,000.  Tia is later robbed of the $10,000

4   by Darrell Stennis' friendly relatives, who you heard about.

5   But this is corroborated by Desirae Evans' testimony that she

6   got two of those pounds of meth delivered to the storage

7   facility, to Bruce Lyons, earlier that day.  I'd suggest that's

8   two of the eight pounds of meth that Chris Tate took.

9          So there's seven bricks still left at Periwinkle.

10  Chris Tate, Jovan Stewart, and Tia Dimmett drive together to

11  Periwinkle.  At first they get two of the bricks out of

12  Periwinkle, that Mr. Tate delivers to Twon, to Antwan Coleman.

13  And, again, you saw the video.  He walks -- Antwan Coleman

14  walks up to the house, looking normal.  A few minutes later, he

15  comes back, and there's this big bulge in his hoodie.  And we

16  know that's the two pounds of meth.

17         Coleman gets in the car and drives off, Tate takes a

18  lap around and comes back.  Tia Dimmett gets the last five

19  bricks out of the house.  Tate and Stewart are going to drive

20  with Dimmett to deliver the meth to who?  To Danielle Dowling

21  and Eric Poore.  But they're stopped on the way with five --

22  with the bricks, five pounds of meth.

23         Looking at the seizures as a source of evidence.  We

24  have seizures from Chris Tate, the five pounds of meth that's

25  found underneath his feet, on the floorboard in the front

1    passenger side of the vehicle, where he's the front passenger

2    on February 21st.  We have 11 ounces of meth seized from Sandra

3    Kellogg at her house on March 19th.  It's packaged into ounces

4    for distribution, along with the other implements of the drug

5    trafficking business, Baggies and digital scales.

6         She also, on that same day, gave a confession that

7    those 11 ounces of meth came from a one-pound deal that she got

8    from Chris Tate a few days before -- or from her source a few

9    days before.  We know that source is Chris Tate by looking at

10   the text messages that were sent from Ms. Kellogg's phone to

11   three cellular phones that were seized from Chris Tate's house.

12        THE COURT:  You've used 60 minutes, Counsel.

13        MR. BLACKINGTON:  We saw the text messages between

14   Kellogg and Tate that led up to the deal, and we also saw the

15   $375 that were found in Dwyatt Harris' pocket.

16        Ladies and Gentlemen of the Jury, we've -- I've talked

17   about the evidence in the case, but I want to go back to

18   something that we talked about that happened, you know, that we

19   talked about on day one of this trial, and it's really, really

20   important, the presumption of innocence.

21        The defendants, at the beginning of the trial, are

22   cloaked in the presumption of innocence.  The government has

23   the duty to prove that the defendants are guilty beyond a

24   reasonable doubt.  We embrace that burden of proof, and I'll

25   tell you why I embrace that burden of proof.

1        As a college student -- well, we hear a lot today

2   about Russia.  They're obviously getting ready to invade the

3   Ukraine; right?  I traveled to the Soviet Union and I spent

4   three months there in the summer when I was in college.  I'm

5   dating myself.  It was the Soviet Union back then.  The burden

6   of proof was different there.  People got arrested, and they

7   had to prove themselves innocent.  They carried the burdens of

8   proving themselves innocent.

9        And I met families and people who had disappeared,

10  relatives that disappeared to the gulags in the Soviet Union

11  and into work camps.  And that's why the burden of proof is on

12  the government, and it's beyond a reasonable doubt.  That's

13  very, very important, and we embrace that burden.

14        But, Ladies and Gentlemen of the Jury, that cloak of

15  innocence that we talked about has been removed.  And at this

16  point the evidence has been presented, and the defendants stand

17  before you for what they are.  They're both drug dealers.

18  They're part of a conspiracy to distribute methamphetamine and,

19  with Mr. Tate, also a little bit of heroin.  And they're also

20  guilty of all of the counts that are charged in the indictment.

21        I thank you for your attention during this trial, and

22  I'll get the opportunity to talk to you again for a few minutes

23  after the defense lawyers give their closing arguments.  And,

24  again, I'd ask you to give the defense lawyers the same kind

25  attention that you've given me.  Thank you very much.

1          THE COURT:  All right.  Thank you.

2          Mr. Riggins?

3          MR. RIGGINS:  Your Honor, could we have a brief

4   restroom break before we get started?

5          THE COURT:  Yes.  We'll go ahead and have a brief

6   restroom break.

7          Ladies and Gentlemen, you're not to begin any

8   deliberation, and no discussion, and we'll have you back in

9   about 10 minutes.

10          THE COURTROOM DEPUTY:  All rise.

11      (Jury out at 11:13.)

12          THE COURT:  All right, guys, quick restroom break.

13          MR. RIGGINS:  Thank you, Your Honor.

14      (Recess at 11:14, until 11:22.)

15          THE COURT:  Before we bring the panel in --

16          You can go ahead and get them, Tanesa.

17          COURTROOM DEPUTY:  Okay.

18          THE COURT:  Mr. Blackington, you were supposed to have

19   e-mailed a copy of the superceding indictment that would be

20   redacted to go back with the jury.  We were going to take out

21   the enhancements.

22          MR. BLACKINGTON:  I think we did before the trial

23   started, but I can certainly do it again.

24          THE COURT:  Can your people make sure?  Because Tanesa

25   can't find it.

1          MR. BLACKINGTON:  Okay.

2          THE COURT:  Okay.

3          MR. BLACKINGTON:  Can I do that after all of the

4  arguments?

5          THE COURT:  Of course.

6          MR. BLACKINGTON:  Okay.

7          THE COURT:  Of course.  But just make sure we get that

8  done.

9          MR. BLACKINGTON:  Okay.  Thank you.

10          THE COURT:  And Tanesa said unless you sent it maybe

11  two weeks ago, but she just looked and she doesn't have it.

12      (Off the record.)

13          THE COURT:  Ms. Kellogg, remember to keep your mask

14  up.  Mr. Tate is doing an excellent job keeping his up.  We

15  don't want the jurors to be nervous, so keep it up.

16          Remember to talk slowly for the court reporter.

17          MR. RIGGINS:  I'll try to, Your Honor.

18          THE COURT:  Okay.  Mr. Blackington naturally is very

19  slow.

20          Court reporters love you, Mr. Blackington.

21          But if you could remember to do that.

22          And you, too, Mr. --

23          MR. BLACKINGTON:  I thought they liked me because I'm

24  nice and charming.

25          THE COURT:  Well, you're easy to transcribe.

1    (Off the record.)

2         THE COURT:  We're going to put the big clock at 90

3    minutes, and I'll let you know when you've used -- so you don't

4    go over your 45.

5         MR. RIGGINS:  Okay.  Thank you, Your Honor.

6    (Off the record.)

7         THE COURTROOM DEPUTY:  All rise.

8    (Jury in at 11:28.)

9         THE COURT:  We're back on the record.

10        And, Mr. Riggins, once everyone is comfortable, you

11   may begin your closing statement.

12              **CLOSING ARGUMENT BY**:

13        MR. RIGGINS:  May it please the Court.

14        Ladies and Gentlemen of the Jury, let me begin by

15   thanking you on behalf of Mr. Tate for your time over this last

16   week.  It's been a sacrifice that everybody has made, and he's

17   greatly appreciative of what you're doing in this case.

18        Mr. Blackington ended by talking about the presumption

19   of innocence, and what's important here is that on February

20   the 7th, when we started this case, Christopher Tate, my

21   client, was innocent as charged.  He had not been proven guilty

22   of anything on February the 7th.

23        And on February the 15th, we're here to tell you,

24   despite everything that you've seen, despite all of what you've

25   heard, that he's still innocent, and that the government has

1   not met that burden to prove him guilty beyond a reasonable

2   doubt of anything.  Not just Count 1, not Count 2, not just

3   Count 3, but of Count 4, as well.  Christopher Tate is

4   innocent.

5         When we started this, along our journey, when I came

6   up and gave the opening statement, I began by telling you this

7   is a case about relationships, the relationship between

8   Christopher Tate and Darrell Stennis, the relationship between

9   Christopher Tate and Tia Dimmett, the relationship between

10  Christopher Tate and Danielle Dowling.  Now, we mentioned some

11  other people during the course of the trial, as well, Desirae

12  Evans.  Many people came in and testified.

13        I mean, you've got a book that we've gone through,

14  over 300 different days, I would imagine, or items, 600-plus

15  pages, all the notes that you've taken along the way, and the

16  thing that I want you to keep in mind is that what the

17  government was doing was kind of like taking you in a forest

18  and naming tree after tree after tree.  And what we all know is

19  that these are trees.  In order for us to get to the bottom of

20  this particular case that's before us, about Mr. Tate, we have

21  to do what was included in the preliminary instructions to you.

22  We have to bring our common sense into the courtroom with us

23  and apply it under these circumstances, and apply it in levels.

24        So what does the government have by way of evidence if

25  we only -- if we only start with what happened in the witness

stand?  So let's peel back the layers, and just like the government when they started with the count possession with intent to distribute, and they talked about Tia Dimmett on February 21st, 2020.  Ms. Dimmett came in here, she got on this witness stand right here, and she tried to convince each one of you that she was this innocent party who was not involved in dealing drugs.  And this is important, because those were her drugs.

And what the government wants you to believe is that somehow Christopher Tate has a possessory interest in those drugs.  They found them in his car, that's true.  Maybe they found them at his foot.  I think the officer's actual testimony was they were under the seat, with it sticking out toward the front passenger foot part.

And who was in the backseat?  The lady who sat on this witness stand, Tia Dimmett.  She was quick to tell you that she placed the gun under the driver's seat, she told you that.  And what we know, drug dealers have guns, they have secrecy, and they never want to accept responsibility for anything that they do.  So Tia Dimmett took and placed the gun under the driver's side seat, she admitted to that.  And then, with those tinted windows, the officer said he couldn't see into the vehicle, she slid the pillowcase up under the passenger side, still having dominion and control of the bricks.

You'll have an opportunity, when you go back in the

jury room, to look at your notes.  I'm not making this up.
Compare what she said to what the officers said.  And then what
is important for you to add in, you've got to take the time and
add in what she was working toward getting by doing what she
said was to testify honestly.  If she was going to testify
honestly to you in this courtroom, she would have told you that
she was not robbed.  She returned the money to the person,
Darrell Stennis' family.  That's not what she told you.

The money that Christopher Tate gave her is money that
she felt that she owned.  And why did she own that money?
Because she was in the drug dealing business.  And she had a
possessory interest in the $10,000 that she said was -- they
placed three guns up to her head.  Come on now.  Three guns?
One gun.  Maybe they told her, "Just give it up."

She told you she started dating him sometime after
November, sometime during the course of December.  And during
the month of January she puts a drug-dealing, purchased
Suburban SUV in her name, and she says she does that because
Darrell Stennis didn't have a driver's license.  That fact was
not confirmed by any other witness.  She put that SUV in her
name because she is a drug dealer.  She reaped the benefits of
being in business with Darrell Stennis.

So when she talks about being robbed of the SUV that
had her name on it in the title, how could you be robbed from
something that you didn't own, that was not yours?  She claims

1      that was hers.

2             Here's the other point that you want to remember as it

3      relates to Tia Dimmett.  Why did she move the seven pounds out

4      of her house and into her grandmother's garage?  Why?  I'll

5      tell you why.  Because she knows how the drug game operates,

6      and she knows that everybody knows that her and her partner

7      were no longer in business, or at least as a team, and so she

8      wanted to move on to the next phase.

9             If the seven pounds were not hers, and if those seven

10     pounds belonged to Darrell Stennis, when his family was there,

11     she could have easily turned the drugs over.  She didn't turn

12     the drugs over to his family because of why?  It's a very easy

13     answer.  It's because she felt as though those were her drugs,

14     her and her partner.

15            Not only did she take the drugs out of the house, but

16     she put the pistol in the bag and took the pistol out of the

17     house, as well.  So she put the gun with the drugs and she put

18     it in her grandmother's house where no one could trace it,

19     hiding her life in secrecy, pretending as if she's some

20     innocent party when she came in here.

21            If she's going to claim ownership to the money, she

22     ought to claim ownership to the dope.  She tells you that it's

23     not her dope, but she was not going to let those seven bricks

24     ever get out of her sight, or in this case the five bricks that

25     they got stopped with in the car.  All she had to do was tell

1    the officer, when the officer came up, "Look, the drugs found

2    in the car, those are mine, they belong to me.  I'm the one who

3    got them out of the garage with the pillowcase and I put the

4    gun under the seat and the pillowcase under his feet."

5        Think about it for a second.  At that moment, on

6    February the 21st, 2020, she had an opportunity to tell the

7    truth.  It's when her mind was the freshest.  Her memory was at

8    its best.  She had an opportunity to explain to the police

9    exactly what was going on.  And you heard the government tell

10   you, drug dealers operate in secrecy.  So what does she do?

11   She cleverly pushed the blame onto someone else, and agreed to

12   cooperate and say otherwise.

13       Regardless of whatever Christopher Tate's calls set up

14   he did, he never had dominion and control.  If -- if, and I say

15   "if" -- if Christopher Tate had allowed himself to have those

16   drugs in the car without her, then you could start thinking,

17   yeah, he has dominion and control, but Tia Dimmett wanted to

18   keep a close eye on her product.

19       And since she had already gotten one 10,000, she knew

20   how the game rolled.  She wanted to get 3,000 for each of those

21   bricks that she had, which would have been a quick 15,000, that

22   she says she was getting out of town, and maybe she'd be

23   willing to let them go for less than that.

24       If, for a moment, you want to believe that somehow

25   those were Chris' bricks, ask yourself, how much did he make?

1   How much did Chris make?  How much money did they find in his

2   pocket on that day?  Tia Dimmett never told you, "Well, look,

3   here's his cut, here's my cut."  So if he was working for her,

4   if he was trying to help her get rid of the bricks, she could

5   have said, "Well, I told Chris I'd give him 500 on each of the

6   bricks that he got rid of for me."  But she didn't say that.

7        What she was doing was trying to rely upon some sort

8   of perceived innocence and talk very softly when she came into

9   the courtroom, as if she had nothing to do with dealing drugs.

10  She allowed Darrell Stennis to bring that dope into her house

11  after dating him only a month -- or less than a month.  She

12  didn't say exactly when she started letting him bring it over

13  there.  She reaped all the benefits of the drug dealer and

14  didn't suffer any of the burden.

15       Remember I asked her those questions on

16  cross-examination?  I didn't say much during the course of the

17  trial, but remember I asked her the question, because I wanted

18  to know, "How is it that you can look in your kitchen and never

19  have noticed there's a red cup on the top of your cabinet?"  I

20  cook a lot, I know where everything is in my kitchen, and I'm

21  sure my wife would say the same thing.  She knows where

22  everything is in that kitchen.  She didn't know there was a

23  mixer there and she didn't know that there was a red cup

24  sitting on top of the cabinet.  That is a lie, Ladies and

25  Gentlemen.

            In addition to that, the gun box.  She tried to act
innocent about that.  You saw the gun box, where the government
found it.  And the money counter.  Now, if Darrell Stennis
didn't live there a lot, why did all that equipment happen to
be inside her residence?  I asked her, was anyone else's name
on the lease, and her answer was no, her name was the only name
on that lease.  She had dominion and control over that
property.  Everything in that property belonged to her, the
drug paraphernalia, the drug equipment that was necessary to
engage in the drug business, and the dope that was found at a
later time.

            All she had to do was give -- if she didn't have any
ownership interest in the property, all she had to do was give
it to Darrell Stennis' family when they showed up.  "Here's his
SUV, here's his dope, here's his money, here's the equipment
that he kept inside my house."  But, no, that's not what
happened.  She came in and wanted to push the blame on someone
else.  And if she was going to testify honestly, what she would
have said was she told the police officers, when they stopped
the car, that she's the one that put the bag into the car.  She
gave the bag to whomever and put it in the car.

            Christopher Tate, he didn't have a grandmother's house
with the drugs in the garage.  Let's think about that for a
minute.  What drugs did they find in Christopher Tate's home?
Were there any drugs packaged up?  They didn't find any of that

1    stuff at his house, because he's always at work.  All these

2    witnesses came through here, all the testimony you heard, all

3    the investigation, and the one thing that you did hear about is

4    that Christopher Tate was going to Mi-Tech.

5         He was getting up at 4:00 in the morning to go to

6    work.  He worked all day.  There's not many people that can say

7    that, only one other person, and that's Dwyatt Harris.  He went

8    to work.  I don't know how often or how long he had a job, but

9    we know that Christopher Tate was a hard-working person.  He

10   took time to leave at lunch to go meet over at Chuck's Market.

11        No doubt that they have him spotted, no doubt that

12   he's doing transactions, but that -- that's not conspiracy.

13   That's not what a conspiracy is.  Conspiracy is when you have a

14   vested interest in your partner that you're doing business

15   with.  It's some sort of more than just a transaction.

16        The U.S. Attorney talked about Krispy Kremes.  I like

17   to think about Costco and Walmart, something I can relate to.

18   When you go to Costco, you buy in large quantities.  It's not

19   unusual for you to see somebody buy 20 cases of Coca-Cola.  And

20   when they buy the 20 cases of Coca-Cola, Costco knows that

21   they're going to take those cases and sell them, a smaller

22   store somewhere.  They sell them singles, maybe in a 12-pack or

23   something like that, but they're going to be resold.  So ask

24   yourself, does Costco have a vested interest in that person who

25   comes and buys that product, even though they know they're

1   going to resell the product?

2          You're going to receive an instruction that talks

3   about a buyer and a seller, and in that instruction it's going

4   to tell you that doing transactions with an individual does

5   not, in and of itself, make you a part of a conspiracy.  It's

6   clean, it's arm's length.

7          Look at your notes and reflect.  How many fronting

8   opportunities did Christopher Tate engage in based on the

9   witnesses who came in here and testified?  Go through your

10  notes.  Take your time and go through the transcripts, as well,

11  the actual fronting acts that took place between Christopher

12  Tate and anyone.

13         Christopher Tate was moving, he was doing

14  transactions, but he was getting his money and moving on, and

15  he did a lot of talking on the phone.  But in the end, Danielle

16  Dowling said there was one transaction that she remembers him

17  doing as fronting.  Desirae Evans said none.  You didn't hear

18  any of those transactions of fronting at it relates to

19  Ms. Kellogg.

20         So where is the conspiracy?  Is the conspiracy

21  somewhere between Jovan Stewart and Christopher Tate?  If it

22  is, maybe we could see some more information.  How did the

23  relationship between them work?  We need to know more about

24  that relationship.  Who was invested in whom?

25         If Christopher Tate had Jovan Stewart running errands

1    for him, and he was paying him, that means that there's nothing

2    more than that.  It's a payment for a service, if that's the

3    case, but we don't know exactly what is the case.  There's not

4    enough evidence.  In all of the wiretaps, there's nothing

5    captured that explains the relationship between Jovan Stewart

6    and Christopher Tate.

7           We hear Stewart talking about coming from out behind a

8    building, giving somebody a bad address, but they didn't front

9    the dope to the person when they did that.  He paid cash on the

10   barrel.  Those are arm's length transactions, the same like

11   going to buy at Costco.  You got the money or not?

12          Now, if Costco were to extend a credit card to you and

13   you could run a bill with Costco, then Costco would need you to

14   go sell those items and come back and pay your bill.  So what

15   did the government try to tell you?  The government tried to

16   tell you that as it relates to Danielle Dowling and Christopher

17   Tate, he needed her to go sell her drugs and come back and make

18   another purchase from him.

19          That's interesting, because remember the name Anthony

20   Burroughs?  Clifford King?  Remember those two names?  Those

21   were suppliers to Danielle Dowling.  Clifford King also went by

22   "Zo."  And what she mentioned to you was that Zo gave her

23   credit.  Ms. Dowling told you she liked dealing with

24   Christopher Tate because he was punctual, he was reliable, and

25   he was professional, cash on the barrel, arm's length

transaction.  There's no conspiracy, not in the least bit.

Read the instruction.  It's there.  You see, you have to throw it all out in the middle of the floor and then count it, and if it doesn't add up to whatever, the hundred, whatever somebody said it was supposed to be, then it's necessary to reevaluate the situation.  We can go back and play all those tapes.  You can go back and record all of them.  And, in fact, if you take a look at them, you'll see there's only really seven days out of all these recordings that we have, there's only seven days of focus of Jovan Stewart, seven days.  When you go back, look at these transcripts, because it's there.

When it comes to Danielle Dowling, go back and look at it.  She says she was doing business every day.  Ms. Dowling says she was selling pounds every day.  Count the number of days that she came in contact with Christopher Tate, and then you'll see she was not dependent upon selling her drugs and going back to Christopher Tate.  Ms. Dowling was going to the best person she could find.  I counted 24, but you count them for yourself.  And the hard reality is, is that if you play those 24 days' worth of calls over and over and over, there's 300 of them in those three binders that you have, at least, somewhere in that neighborhood, but it boils down to 24 days.

Ms. Dowling explained to you that she was dealing with Clifford King and Anthony Burroughs.  She talked so fast on the wiretap, so slow in court, that you know she had to be using

1    drugs.  Come on.  She was high on those drugs.

2         And remember, remember I showed her the guideline

3    table?  There was a reason why I showed her the guideline

4    table, because at the bottom of the table there's a number 43

5    in the category I, which is the first one in the left-hand

6    column.  And you have that exhibit, you can go back there and

7    look at it.  When you look at that position, if you take it

8    down to the bottom row, you see life.  Life.

9         And I asked her, "Do you know what life means?"  She

10   said, "Life means life."  And then she tried to tell you she

11   didn't know it until she got to court that day.  Testify

12   honestly.  And you're going to go from life to 14 years?  A

13   whole lot of motivation in that, from a possible life sentence

14   at the high end to what she's expecting is 14 years.  Out of

15   her own mouth.

16        She can't remember which one of the people she was

17   buying and getting drugs from.  If she did it every day over a

18   three-month time period, it couldn't have been Christopher

19   Tate, because, as you count them up -- count them up -- there

20   are 24 days, I believe.  But you count them on your own.  That

21   means the other 90 days, the other 90 opportunities were

22   somebody else.  It's not Mr. Tate.

23        And if you want to throw Mr. Tate in there with all of

24   the other stuff that she had going on, that's different.  You

25   did not see 15 people connected to Mr. Tate like you saw 15

people who were distributors for Ms. Dowling.  I asked her each and every name on that sheet that I had, and what was her response?  Yes, yes, yes, yes, yes.  Fifteen times she answered yes.  "Did you deal drugs to the following person?"

And remember, in her network, she fronted the drugs to the people.  If you examine one of the phone calls, you'll remember that there was a gentleman at 3600 on College who was trying to get his money together to repay her for some drugs she fronted to him.  And she was trying to get -- purchase some drugs from Christopher Tate.  And Tate could have easily said, "Hey, come get it, and then, you know, pay me later," but he didn't.  She had to pay cash on the barrel.  "I don't care where you get the money from, who you get it from, you got to pay cash on the barrel."  That's not a conspiracy.

Tate wanted to know, was Hollywood good for it?  That's a credit check.  All he was doing was running a credit check.  There's no execution of that transaction, that I recall.  Maybe you recall.  Look at it and see.  The evidence is before you.  You got all the stuff.  Peel back the layers, listen to the testimony, or look at your notes that you had from the testimony that happened on this witness stand.

Seven days' worth of calls and information with Jovan Stewart, 24 days' worth of calls, texts, information with Danielle Dowling.  And the question is whether that amounts to conspiracy, not whether they did a transaction, a drug deal on

1    each of those occasions.  We all saw and heard, clearly some

2    drug dealing going on.

3           Now, not everybody sees exactly the same thing,

4    because what's interesting is the young lady who spoke Spanish,

5    who came in, and we had an interpreter, who was quick to

6    testify about she could identify Christopher Tate, and was able

7    to identify him in the courtroom, identified him as about her

8    height, 5'3".  If she got that wrong, what else did she get

9    wrong?  She said his hair was about shoulder length.  Clearly,

10   you saw his dreads.  His dreads were all the way down to his

11   waist, almost.  She was nervous, she was working for the police

12   and trying to get as much information as she could, but she was

13   nervous.  Whether that was Chris Tate or not, we don't know.

14   That's in question.

15          But we didn't hear from Lacey Guzman, who was

16   evidently in the room; and we didn't hear from the other person

17   who was in the room, so it could have been anybody's drugs who

18   came in and did those transactions and moved on.  The drugs

19   that they found on that occasion do not belong to Christopher

20   Tate, and they didn't prove it.  That's the most important

21   thing.  It was not proven, not at all.

22          The other count is a Jovan Stewart count.  It's not a

23   Christopher Tate count.  And at some point people need to be

24   held accountable for what they did along the way.  Christopher

25   Tate is innocent of Count 1 by far, conspiracy.  No doubt about

1    it.  Was he transacting drugs?  Yes.  You could hear it, you

2    saw it.  I'm not hiding it from you.  The question is

3    whether -- was it a conspiracy?  It's a very easy answer.  The

4    answer is no.  No to the conspiracy, no to Danielle Dowling, no

5    to Desirae Evans, no to Darrell Stennis, no to Jovan Stewart,

6    no to all of those people that we talked about.

7           He had a relationship.  So, like I said when I came in

8    and I did my opening, I told you that we were going to talk

9    about relationships, that in order for you to make a

10   determination as it relates to each of the counts that

11   Christopher Tate is charged with, is that you have to examine

12   the relationships between him and the parties that were there.

13   Who had a direct connection to Christopher Tate?  And how can

14   we evaluate the evidence as it relates to those individuals?

15   It comes up woefully short.

16          For the people who came in and testified and blamed

17   others, shame on them.  Danielle Dowling testified honestly.

18   She gave everything she had.  She didn't hold anything back.

19   She was very straightforward about what she said.  The most

20   important thing that she said, as it relates to Christopher

21   Tate, is that he didn't front her, and if he did, it was one

22   time.  That's not a conspiracy.  Don't be fooled by anything

23   other than that.

24          There's no advice to her.  I asked, "Was there any

25   advice that Christopher Tate would give you on how to run your

business better?"  "No."  There was no advice that Chris Tate

told her on how to cut the drugs and make it go further, no.

Was there any advice that Chris told her to look out for law

enforcement?  No.  It's not there.  There's no red cup found in

his car, there's no mixture of any heroin, methamphetamine, or

anything else found at his house or in his vehicle.  There's no

weapon found on him, his person.

There was a gun found at his girlfriend's house.

There's nothing illegal about having a gun in your house if

you're licensed to carry it, but there was no gun found on him,

on his person.  If he was truly the drug dealer that they say,

that kind of drug dealer, he would always have a weapon on him.

Instead, what was he doing at least eight hours of his day,

every day?  He was working at Mi-Tech.

And I asked them, "Did you have any idea how many

hours that Chris Tate worked in a day?"  And the answer was,

"No."  I mean, if you're going to follow him, if you're going

to put a surveillance on him, why wouldn't you sit down and

watch him at work, see how long he actually stays there, how he

interacts with individuals.  There's no investigation about

that.  There's no information that was given to us about that.

We see Chuck's Market as a meeting place, but what we

don't see is something more than just a transaction.  When you

go back into your room and you deliberate, I ask you to look at

all the evidence.  Take the time and go through and summarize

1    the evidence.  Funnel it down into a workable format.

2          Don't get caught up with them showing you tree after

3    tree after tree, which in this case indicates transaction after

4    transaction after transaction after transaction.  Pull it back

5    and say, "Show me the transactions where both parties are

6    invested in this transaction."  And when you discover that you

7    can't reach that burden, hold them accountable.  Say, "Not this

8    time."

9          I'm going to end the same way that I started.  Tia

10   Dimmett was a drug dealer who didn't want to take

11   responsibility for the drugs that she possessed.  She had

12   several opportunities to tell Darrell Stennis' family, the

13   police, and then you the truth, and she chose not to tell

14   anybody the truth.  She was deceptive with his family, she was

15   deceptive with the police when she was arrested.  And then,

16   when she came in here, she wouldn't admit that she -- it was

17   her money counter, her red cup, her mixer, her kitchen, her

18   lease, all in her name, and the SUV.  Hold her accountable, but

19   not Christopher Tate.

20         When you get your verdict form, there's going to be a

21   space on there that has "Guilty" and a space on there that has

22   "Not Guilty."  As it relates to Christopher Tate in Count 1,

23   Counts 2, 3, and 4, I'm asking you to mark either a checkmark

24   or an "X" in "Not Guilty" on each of the counts.

25         Unfortunately, the government didn't meet its burden.

1      They welcomed that burden and they didn't meet it this time.  I

2      thank you for your time.

3                  THE COURT:  All right.  Thank you, Mr. Riggins.

4            Mr. Thomas, you may give a closing statement on behalf

5      of the defendant, Sandra Kellogg.

6                  MR. THOMAS:  Thank you, Your Honor.

7                           **CLOSING ARGUMENT BY**:

8                  MR. THOMAS:  I am happy to have that off and happy to

9      have a chance to talk to you all today.

10           I had remarks ready to give, I've been practicing a

11     little bit, but I really have to start in a different spot

12     because I have to tell you that just because the federal

13     government says something doesn't make it true.  And just

14     because the Assistant United States Attorney tells you

15     something, that doesn't make it true.

16           It's important to note that your job is to evaluate

17     the evidence that you heard and apply the law as the judge

18     gives it to you in the instructions.  That's it.  And, in fact,

19     in your final instructions, you're going to be commanded that

20     you must make your decision only on the evidence that you saw

21     and heard here in court, and that the evidence includes only

22     what the witnesses said when they were testifying under oath

23     and the exhibits that were allowed to be admitted, and any

24     stipulations that the parties made.  That is the evidence, the

25     testimony, the exhibits, the stipulations.  Nothing else is

1   evidence.  Lawyers' statements and arguments are not evidence,

2   thank goodness.

3          Now, there were several things that Mr. Blackington

4   said to you.  Some of them are important and some of them

5   aren't, but several times he tried to lead you down a path

6   about things that were never testified to here.  He said

7   several times, "I suggest to you," "that you can infer," "what

8   does this mean?"  Well, that's his opinion, that's all well and

9   good, but you're not to base your decision on his opinion.

10  Just because the federal government says it doesn't make it

11  true.  It's the evidence that you heard.

12         So I'm going to get back to a couple of things, but

13  just for example, he threw out, "Well, apparently Christopher

14  Tate knew that Mr. Harris used to drive a different car, and

15  Ms. Kellogg knew Mr. Brown," or thought she did.  Actually, she

16  didn't say she knew Mr. Brown.  She asked, "Is that the same

17  guy I met before?"  She never -- it was never clear whether it

18  was.  She was just asking, "Hey, do I know this guy?  Is he the

19  same guy that I met before?"  That's the evidence.

20         What Mr. Blackington took from that is, well, you can

21  infer that there were lots of prior drug deals.  That is

22  nonsense.  There is no evidence at all of prior drug deals from

23  the evidence that you heard, and you are not allowed to just

24  speculate about something because Mr. Blackington suggested

25  it's true.

1        "The $375 that was in Mr. Harris' pants pocket, well,

2   that must be evidence that he sold drugs."  There's no evidence

3   of that at all.  He had a job.  He worked at Jiffy Lube, as

4   most drug dealers do, I believe.  There's no evidence as to

5   where that money came from.  You can speculate all day, but

6   when you base your rulings on the evidence, you can't come to

7   that conclusion.

8        And there are several other things that were

9   mentioned, that I'm going to touch on, but I wanted to touch on

10  that first and foremost, and that is suggestions.  When anybody

11  says, "I suggest to you," that should be kind of a big red flag

12  that you didn't hear that in the evidence.  You know what it

13  is.  You heard a lot of evidence in this case.

14       I told you at the beginning of the trial that this was

15  going to be a hard case as it relates to Ms. Kellogg, and you

16  were going to have a hard job.  And I've worried about it,

17  because what I'm asking you to do as a juror is something that

18  not everyone has the capacity to do, and that is asking you to

19  do a very specific job that you were brought here to do.

20       And that very specific job is to determine whether or

21  not Sandra Kellogg was in a drug distribution conspiracy with

22  Chris Tate.  Not whether she's a good person, not whether she's

23  made bad decisions, not whether she used to be a criminal, was

24  a criminal, is a criminal, has done bad things.  I'm not asking

25  you that.  I'm asking you to determine whether, from the

1    evidence that you heard, that she conspired, that she agreed,

2    with Christopher Tate to distribute drugs for him.  That's the

3    way Mr. Blackington put it, Sandra Kellogg sold meth for Chris

4    Tate.  That's the accusation.

5         Why is that hard?  Because plenty of people can't do

6    it, honestly.  There are plenty of people that would look and

7    say, "Yeah, okay, I see that.  You know, I don't see an

8    agreement here, I don't see that Mr. Tate has any kind of

9    vested interest in what she's doing, I understand.  You know,

10   this is a buyer/seller relationship and the law is going to

11   tell me that that doesn't mean it's a conspiracy.  I get all

12   that, but, clearly, she was selling drugs up north, so I'm

13   going to find her guilty."  Well, that's wrong, and you can't

14   do that.

15        And that's hard for some people.  Some people could

16   never get past that.  Look, she did something wrong, she did

17   something wrong, but you are here to decide this very specific

18   case.  And I hope you all can do that.  And I think you can.

19   But you understand my concern is that some people can't, so

20   when you're deliberating, it's about this case, not every other

21   case, not whether she's a good person or not.  And the fact is

22   that the government is not going to make its case as it relates

23   to her in a conspiracy.

24        We did hear a lot of evidence in this case over

25   several days.  I think it's important to note most of it had

nothing to do with Sandra Kellogg.  Of all of the people who came in and testified about their various dealings, none of them mentioned Sandra Kellogg.  In all of the recordings, you have conversations between Sandra Kellogg and Christopher Tate, but you never hear Sandra Kellogg's name mentioned by any of the others in any of the other transactions.

Now, I guess Mr. Blackington's theory is that that's because everyone is, I believe his word was, "compartmentalized."  Well, of course, nobody knows anybody else in a drug deal, everybody is very careful, and you're on a need-to-know basis.  Was he in the same room with the rest of us when we heard all of these tapes, all of these recordings?

All of these people knew each other.  They were all cross-pollinating.  "I'm going to ask Guzman about Hollywood, I'm going to ask Dowling and Hollywood to go together."  They all knew where each other lived.  You know, "Come on over to the house," says Hollywood.  Mr. Tate doesn't say, "What are you talking about?  We're compartmentalized.  I don't know where you live."  He says, "No, I'll be right over."  He knows multiple places where Ms. Dowling lives.  Now, that doesn't make them co-conspirators.  That makes them connected.

So this idea that, well, look, Ms. Kellogg, we gave them a fake address, but that was because nobody knows anybody in these kind of deals.  Look at the evidence yourselves.  Everybody knew everybody.  When Ms. Dowling is talking, she

1    name-drops all kinds of people, all of her 15 customers.

2    Sometimes it's, "Hey, my customers are going to be at the KFC.

3    I don't really have the money yet.  Why don't we just do all

4    this together.  You come meet me, I'll bring my customers,

5    we'll all get together."

6          That doesn't sound like secrecy to me.  That doesn't

7    sound like anybody trying to protect anybody.  That doesn't

8    sound compartmentalized.  The only thing that I see from this

9    case -- now, look, Mr. Blackington has a lot of experience and

10   he's seen a lot of cases.  I'm talking about this case and

11   these people's conversations, and the idea that they're

12   compartmentalized is nonsense.  The only person who's kept at

13   arm's length is Ms. Kellogg and her boyfriend, Mr. Harris.

14         So this is a conspiracy to distribute controlled

15   substances.  As it relates to Ms. Kellogg, it is a conspiracy

16   to distribute methamphetamine.  Because we know, from all of

17   the testimony and all of the evidence, that there was never an

18   instance where Ms. Kellogg was involved with heroin or fentanyl

19   or anything else, so it's a conspiracy to distribute

20   methamphetamine.

21         What's a conspiracy?  An express or implied agreement

22   between two or more people to commit a crime.  What crime?  Any

23   crime?  No.  A specific crime in this case was to distribute

24   controlled substances; for Ms. Kellogg, distributing

25   methamphetamine.  It doesn't require actual unlawful

1    distribution.  It's simply an agreement to do so.  As

2    Mr. Blackington put it, did Sandra Kellogg sell meth for

3    Mr. Tate?  And that's really what it's about, and that is the

4    problem with the government's case.

5          And that's because what we have here between

6    Ms. Kellogg and Mr. Tate is a buyer/seller relationship.  Now,

7    fortunately, we have jury instructions, and the jury

8    instructions tell you all what the law is to apply.  You don't

9    have to guess and you don't have to decide.  The law is told to

10   you as to what it is.  And fortunately for Ms. Kellogg, the law

11   is on her side.

12         So a conspiracy, you'll be told what the law is, that

13   a conspiracy requires more than just a buyer/seller

14   relationship between a defendant and another person; that, in

15   addition to that, a buyer and seller do not enter into a

16   conspiracy to distribute controlled substances simply because

17   the buyer resells the drugs, even if the seller knows that the

18   buyer intends to resell the drugs.

19         What the government has to prove -- what moves it from

20   a transaction to an agreement is that they have a joint

21   objective in further distributing the drugs, not their

22   transaction, but agreeing to help one person distribute drugs

23   further to others, distributing the controlled substance to

24   others.  And that's going to be in the instruction that you

25   get.

1        Now, what can be evidence of a conspiracy beyond a
2   simple buyer/seller relationship?  The first thing, number one,
3   receiving drugs on credit, a front, a float, I'll throw it at
4   you, receiving drugs on credit.  Mr. Riggins pointed that out,
5   that once you make a purchase, and whether it's in drugs or
6   anything else, if I'm simply buying a product, what I do with
7   it afterwards is not part of the transaction.

8        You know, Mr. Blackington went through the Krispy
9   Kreme analogy pretty detailed, and he got all the way down, the
10  owner, the CEO, the truck driver, the bakery worker, the guy
11  running the register, but the one guy he leaves out is the
12  customer; right?  Because the customer is not part of the team.
13  Important?  Sure.  Do they like having customers?  Yes.

14       But I'll tell you what.  The way to look at it, if I
15  go into the doughnut shop and I buy a doughnut, and I've paid
16  for it, the doughnut shop don't care whether I eat it or I give
17  it to my kid, whether I throw it in the trash or feed it to the
18  birds.  They do not care.  They have no vested interest in what
19  I do with the doughnut after I bought it.  The transaction is
20  over.  And that makes sense.

21       If I go into Kroger and buy a gallon of milk, they
22  don't care if I drink it.  They don't care if I dump it on the
23  ground.  They might like if I dump it on the ground and come
24  buy another one.  They do not care.  They don't care if I say
25  I'm going to open a chocolate milk stand in my front yard and

1    I'm going to go to Kroger and I'm going to buy milk and I'm

2    going to then -- I'm going to sell chocolate milk in the front

3    yard.  They don't care.  You've already bought your milk, and

4    they don't care whether you sell any at your stand or not.

5         And that's important, because that's really what you

6    have to decide in a conspiracy.  Does the seller have a stake

7    in what you do later?  You've heard evidence about Ms. Kellogg

8    buying drugs, no doubt about it.  You've seen evidence that up

9    north it looked like she was sharing drugs, selling drugs with

10   other people.  That's not what she's on trial for.  We're not

11   up north.  That's not what she's on trial for.

12        So all of that evidence about, "Well, look, clearly

13   she was going to resell those drugs," the instructions will

14   tell you it doesn't matter if she was going to resell the

15   drugs.  Proving that she was a small-time drug dealer is not

16   why we're here.  It's whether or not she was conspiring to help

17   Mr. Tate distribute drugs to other people.  Once he gave the

18   drugs to her, he wasn't distributing anything to anybody.  He

19   was done.  Every one of her transactions with him was cash.

20   These are one-ounce deals, except for the last one, and we'll

21   talk about that for a minute.

22        But so what are some other reasons, other ways that a

23   buyer/seller relationship can be a conspiracy?  An agreement to

24   look for new customers, maybe get a commission on sales for new

25   customers.  So if Ms. Kellogg is on the phone saying, "Hey, I

1    got a friend, you can trust him.  I'm going to bring him over,

2    he's going to buy drugs from you.  I vouch for him," "Hey,

3    okay, send him over.  I'll give you a deal next time.  Hey, you

4    know, send him over, I'll give you 50 bucks, I'll give you a

5    commission.  I'm helping your business, I'm going to send you

6    new customers."

7         One party advising the other party on the conduct of

8    their business.  "Listen, when you sell those, make sure that

9    you package them in a certain way.  Make sure you sell the best

10   stuff to your best customers," something like that.

11        An agreement to warn of future threats to the

12   business.  "Hey, you know, I heard the -- I heard that one of

13   your buddies has talked to the police, you better be careful.

14   Hey, I heard one of your competitors is trying to steal your

15   customers."  I'm helping; right?  Some agreement to help the

16   drug dealer sell more drugs to other people, whatever that

17   might be.

18        Now, for Sandra, never a front, always cash up front.

19   Random sales, six over three months, always initiated by Sandra

20   Kellogg.  You did not hear, and you're not going to hear, when

21   you look at these one time where Mr. Tate calls Sandra Kellogg

22   and says, "Hey, you need anything?  Hey, it's been a while.

23   Come buy drugs from me."  No.  She calls him, in fact, never

24   called any of his associates.

25        These are small sales, these are one-ounce deals.

1    This is not part of Mr. Tate's regular business.  We know that,

2    because we remember Michelle, last name unknown, that's all we

3    know about her.  Apparently the government didn't care who she

4    was.  We knew her first name, we knew her phone number, we knew

5    she drove a white Nissan Cube, but other than that, I guess we

6    couldn't find her.  But she wanted to buy an ounce, remember.

7    Mr. Tate, "I don't mess with that.  You know, talk to my buddy.

8    Talk to Dowling."  Dowling set her up.

9          Never a discussion of their business.  Was she selling

10   small amounts of drugs?  It looks like it, up north.  Trish,

11   J., yeah.  Did she ever talk about that?  Did she ever mention

12   her customers the way Ms. Dowling mentioned her customers?  Of

13   course not.  And Mr. Tate never -- expressed no concern over

14   the quality of the drugs that she received.  Remember -- and

15   never encouraged her to sell drugs, never told her, "Hey, get

16   out there and hustle, get back here soon.  You're moving drugs

17   for me."  Not at all.

18         Mr. Blackington said there was no evidence that these

19   folks had a social relationship, Mr. Tate and Ms. Kellogg.  I

20   would submit that there is evidence that their relationship was

21   different than the rest of these people.  Remember, when he got

22   in trouble or thought he might be in trouble, he contacted

23   Ms. Kellogg, not to sell her drugs, but to say, "Hey, here's my

24   mom's phone number, here's my dad's phone number, here's my

25   date of birth in case I'm going in"; right?  "My friend, help

1   me out."

2          Now, did he say, "And make sure your hide all those

3   drugs," or, "Make sure you go talk to Peso and buy more drugs"?

4   No, it was nothing about drugs.  It was, "Hey, you know, if

5   something happens, here's my mom's number."  Who else did he

6   give his mom's number to?  I would say nobody, certainly none

7   of his compatriots.

8          We can look at Dowling versus Kellogg.  Dowling, who's

9   moving three pounds of drugs a day, every day, transactions

10  with multiple people.  There's an interactive business between

11  all of these people, concern about quality.  You know, Tate

12  tells Dowling, "Hopefully this shit right here," meaning better

13  quality meth, "we'll get -- you'll get your people back

14  rolling.  I'm concerned about the quality, I'm concerned about

15  what you do.  If you -- if you give that poor quality meth to

16  your people, it's going to F up the money again."  Interactive

17  business.

18         They all knew -- they knew where each other lived.

19  Ms. Kellogg got a bullshit address.  Remember Peso?  "Not only

20  do we give him a false address, I'm going to sneak out from the

21  back so he don't know where we're from."  They knew one

22  another's customers, Tate and Dowling, and as was mentioned

23  before, at one point Mr. Tate said, "I'll" -- "I wish I could,

24  I'd help you go deliver drugs."  Now, does that make them

25  conspirators?  Not necessarily.

1        But what it shows is that Ms. Kellogg is in a

2   completely different place.  You know, when -- with so much

3   worry about the quality of the methamphetamine, remember when

4   Peso, during that whole time, when they had good and bad, you

5   know, Peso said, "What do you want me to give them?"  "I mean,

6   it don't really matter.  Do whatever you want to do.  It don't

7   really matter."  Why?  Because he doesn't care.  It's a

8   one-time deal, an ounce deal, that he doesn't normally do to a

9   friend of his who contacts him every once in a while to buy

10  something.  That does not make her a co-conspirator.

11       Now, is there an agreement between Mr. Harris and

12  Ms. Kellogg?  Yeah.  It's her boyfriend.  We know that he went

13  and picked up drugs for her.  We know that.  They had an

14  agreement together to distribute drugs, which, in and of

15  itself, is a conspiracy, but it's not this conspiracy.

16       And you're going to be instructed about that, too,

17  that if there's more -- if you find there's more than one

18  conspiracy, ultimately the conspiracies have to be connected to

19  the larger conspiracy that's being charged here.  What is that?

20  The conspiracy that Ms. Kellogg has agreed to help Mr. Tate

21  distribute drugs to others.

22       And you'll be told that in order to be found guilty of

23  Count 1, the conspiracy that she was in has to be part of the

24  larger conspiracy, and it's not.  Why?  Whatever she agreed to

25  with Mr. Harris, that they were going to do, all occurred after

1    these transactions, cash on the barrel.  What vested interest

2    did Mr. Tate have in any of this methamphetamine once it was

3    sold?  The answer is none.

4         And if he has none, then she's not selling drugs for

5    him.  He has -- he doesn't care.  He's already got his money,

6    just like Kroger with the gallon of milk.  I got my money.  You

7    want to do all those drugs, go ahead.  You want to sell them,

8    you want to give them to your brother, I don't care.  You know,

9    and he really doesn't care with her, because these are

10   one-ounce throw-off deals.  He's a pound guy.  These are

11   one-ounce deals for an old friend.

12        So Harris is helping Kellogg, but Kellogg is not

13   helping Tate.  So all of the discussion about, well, look,

14   Mr. Harris, maybe he's selling drugs for Ms. Kellogg, maybe.  I

15   don't know.  That's not part of this case.  There wasn't any

16   evidence presented about that.  We're only supposed to listen

17   to the evidence that we heard.  But it doesn't matter, because

18   what vested interest does Mr. Tate have in any of the stuff

19   that they're doing in Silver Lake?  None.

20        So it would be different if this was a front.

21   "Listen, I'm going to give you these drugs and you go sell

22   them, and then I'm going to make my money."  Then you're darned

23   right I got a vested interest in what you do.  I do care.  "You

24   better not give those drugs to your brother, because those are

25   my drugs.  You didn't pay for them.  Those are my drugs you're

1    selling."  No, these are not his drugs.  She paid for them, she

2    left.  Buyer/seller, and that's it.

3         There can be multiple conspiracies, but if she's in a

4    different conspiracy, an agreement with her boyfriend, that

5    conspiracy has to be within conspiracy number one.  So don't be

6    confused, don't get lost.  Don't be someone who says, "Listen,

7    I think she's a bad person, I think meth is bad, and I'm going

8    to punish a bad person," because you're a terrible juror if you

9    do that.  It's not your job.  Your job is very precise, and

10   that is to hold the government to a burden, beyond a reasonable

11   doubt, that a conspiracy took place between Ms. Kellogg and

12   Mr. Tate where she agreed to sell drugs for Mr. Tate, and

13   that's the way the government put it.

14        Obviously, she did not for the reasons that she said.

15   Did she buy drugs?  Yes.  Buyer/seller, as you'll be

16   instructed, is not a conspiracy.  Did she sell drugs?  It looks

17   like it.  We don't know that for sure, but from the text

18   messages, it looks like it.  We don't know.  Maybe she gave

19   them away.  Was she transacting, was she distributing?  Yeah,

20   probably, but that's not your job.  That's up north.  That's

21   for somebody else to decide.

22        You're to decide this case only, and in this case, I'm

23   sorry, the law is on my side.  This is a buyer/seller

24   relationship, there is no vested interest for Mr. Tate.  It's

25   simply not part of a conspiracy, none of the things that you

1   look at, no credit, no worrying about her business, no

2   encouraging her business.  She's not helping his business.  No,

3   she's not storing drugs for him, she's not delivering drugs for

4   him, she's not laundering money for him.  She's calling him

5   once in a while, "I need something."  "All right, come down."

6   Now, other people, "Hey, I need an ounce."  "I don't mess with

7   that."  "All right, Kellogg, I'll help you out."

8        You know, you're sending your boyfriend, I don't even

9   know his name.  I don't trust you too much, we're not going to

10  tell you where we live or anything, but not like -- certainly

11  not like Ms. Dowling.  Every time she moves to another Airbnb,

12  because she's out on the lamb as a fugitive, he knows where she

13  lives.  Nothing like that.

14       So that's what I would ask you to do, Ladies and

15  Gentlemen, is the really hard job of coming to the conclusion

16  that, for whatever she did and the poor choices she made and

17  the crimes she committed, the one she did not commit is what's

18  being charged here as a conspiracy.  She did nothing to help

19  Mr. Tate distribute the drugs that she bought, because once she

20  bought them, they were hers, and he had no interest in what she

21  did with them.

22       It kind of reminds me -- you know, we have our

23  analogies.  We had Krispy Kreme, of course, we've talked about

24  that a lot, and Costco.  The one I thought of, I was a kid

25  growing up in the country.  There used to be a little bread

 1    company, and they had a little bakery, factory/bakery built,

 2    you know, loaves of bread, nothing major.

 3          But they had a little store, that you could go to the

 4    store and buy, down the street, and they also sold to grocery

 5    stores locally.  But then they also had a little outlet store

 6    at the factory itself.  And that was probably for old bread or

 7    stuff they couldn't sell, I don't remember, but it was a little

 8    different.  It wasn't their store, but it was a little outlet

 9    at the factory.  And these were all part of the same business,

10    but they were all different.

11          So in their own store -- they would bake something in

12    the factory and take it down to the store.  Well, as it relates

13    to what we're talking about, that's a front; right?  Hey, you

14    know, you're not buying the drugs down at our store.  We're

15    just -- or the bread.  We're taking it down there, and when we

16    sell it, we're going to make our money.

17          The second kind is, well, we're going to sell bread to

18    the grocery store.  Now, they may pay cash up front, but

19    there's an ongoing relationship, there's a contract.  You're

20    going to sell a certain amount on a certain time, and they're

21    probably going to have some interest in how they do it.  You

22    know, we want our bread on the top shelf, we want you to take

23    it off the shelf after a few days, don't sell stale bread.

24    There's a relationship there, even if they pay cash.  But then

25    you've got the outlet, the factory.  And if somebody wants to

1    come by and buy a loaf of bread, we'll let them.

2         And that's kind of what I see going on here.  We have

3    a big operation with a lot of people, and then over on the

4    side, for my friend, Ms. Kellogg, she can get an ounce.  You

5    know, we saw numerous times where there were suggestions of

6    fronts for other people, whether they happened or not.  "Hey,

7    if you don't have enough money, figure it out.  You know, bring

8    what you got.  I'll sell you four for three and a half.  We'll

9    make up the rest.  Let's figure something out."

10        Remember, Ms. Kellogg this last transaction, when it

11   had to be a pound, it's ugly out there.  Mr. Tate said, "It's

12   got to be a pound."  "Well, I don't have enough money.  I only

13   got 2,800."  It would have been a perfect opportunity, if

14   you're co-conspirators, to say, "Bring the 28, we'll settle."

15   Nope, simple, "No, I want 3 Gs."  "I got 28."  There wasn't

16   any, "We'll work it out."  There wasn't any, "Bring what you

17   got, we'll figure it, you'll owe me.  How soon can you have the

18   rest of the money?"  Nope, "Three, cash on the barrel."  That's

19   the kind of relationship that these folks had.

20        So it's clearly a buyer/seller relationship.  There's

21   clearly no agreement with Mr. Tate beyond the purchases.  This

22   is the outlet store, not part of their overall operation of

23   pounds and pounds of meth.  An ounce here or there.  "I don't

24   sell ounces, but I'll make an exception for my friend."  That

25   doesn't make her part of the conspiracy.  It makes her stupid,

1    it makes her doing the wrong thing, undoubtedly, but it doesn't

2    make her a co-conspirator.

3         And the hardest thing for you guys is to put that all

4    aside, put aside these ideas of, well, you can speculate about

5    what Mr. Harris was doing and you can speculate about the white

6    Mercedes and prior drug dealers -- deals, and you can -- you

7    can't speculate.  The evidence is what it is.  And you apply

8    what you heard to the law given to you by the judge.  And when

9    you do, you will see that all of the rest of that is smoke.

10        It doesn't matter if she was selling drugs.  The

11   question you have is, was she selling drugs for Mr. Tate.  And

12   the answer is, no, never, she was not.  And it's clear.  You're

13   doing the right thing by applying the law.  You're not helping

14   anyone by throwing out those rules and saying, yeah, but, you

15   know, the federal government, they worked hard here, they

16   really want to convict this person.

17        No.  Look, they bring a case, they show you the

18   evidence, you decide.  Nobody questions that.  You're not

19   accountable to anybody but yourselves.  You don't have to

20   justify what you do.  When you come and see this evidence and

21   see that it's not proof beyond a reasonable doubt of a

22   conspiracy, you vote not guilty, and that's the end of it.

23        The other count is possession.  We'll look at that.

24   It's all circumstantial.  We do have text messages back and

25   forth, we do have what looks like a transaction, but none of

1    that was taped, none of that was surveilled.  We don't really

2    even know who brought the drugs there.  So it's very, very

3    circumstantial.  And you can look at that and evaluate it as to

4    whether they proved that that happened on the day it happened

5    in Indianapolis, and what was there was meth.

6           The important thing is, there was no conspiracy here,

7    and that's the important thing for you.  And when you go back

8    and look at everything, remember the law, read the

9    instructions.  They tell you what the law is, not what

10   Mr. Blackington wants it to be, not what I want it to be, what

11   it is.  And the law is clear that simply being a buyer does not

12   make you part of a conspiracy.  And, like it or not, those are

13   the rules.  And when you apply them to these facts, there's no

14   question, no question.

15          And remember, the last thing, don't get confused about

16   Ms. Kellogg and her boyfriend, Mr. Harris.  Don't be confused

17   that, well, they were in a conspiracy, that sounds like a

18   conspiracy, done.  No.  Their agreement only comes into play if

19   they were part of the bigger conspiracy.

20          Now, Mr. Harris clearly is not part of any conspiracy

21   with Mr. Tate.  He doesn't even know his name.  He's using

22   Ms. Kellogg's money.  He's just there as a runner to pick it

23   up.  Now, he's the same as Ms. Bow, the elderly heroin addict.

24   "Granny out there thugging," I think she was referred to.

25   Bless her heart.  He's just there to pick it up.  They don't

1    even know his name.  They're not even going to give him the

2    right address.  There's certainly no front.  There's certainly

3    nothing with Mr. Harris beyond he's going to take those to

4    Ms. Kellogg.  He's not conspiring with anybody, maybe, other

5    than Ms. Kellogg.  So it doesn't work that direction.

6         And, obviously, as I've talked a long time, these are

7    simply cash transactions.  There's no ongoing arrangement.

8    There's certainly no front.  There's certainly not a deal every

9    day.  It's random, two of them two days in a row.

10        Think about it.  You're Ms. Kellogg, you're a meth

11   user, a small-time dealer, you live in Indianapolis.  Your

12   boyfriend lives and works in Indianapolis.  You move back home

13   to Silver Lake.  You're still a meth addict and a small-time

14   dealer.  What are you going to do?  Are you going to go out on

15   the mean streets of Silver Lake, Indiana, and look for meth, or

16   are you going to call your old friend every once in a while and

17   say, "Hey, can you help me out?"

18        Because every one of these, it's her calling him, "Can

19   you help me out?"  I'll have Mr. Harris do it because he works

20   down here, he comes up on the weekends.  We saw from the cell

21   towers, every weekend he comes up to visit.  Why don't we have

22   him go pick it up because he's already in Indianapolis.  Go to

23   somebody I know, not somebody new.  That's all there is.  It

24   doesn't make her part of a conspiracy.  That just makes her a

25   buyer.  So it makes sense.  You'll see it.  It is what it is.

1    She's done wrong, she'll have to answer for that, but not here,

2    not on this conspiracy, because the law says she's not

3    conspiring.

4          So it's going to be hard if you're not smart, but I

5    think you're all smart.  I think you all can think in the

6    abstract.  I think you can separate emotion from reality,

7    emotion from the law, and say, look, in this case that's not

8    what this is.  I hope you do, because it couldn't be clearer

9    when you apply the law as it's been told to the facts that

10   you've seen.  It doesn't make it easy, but it's clear.  I thank

11   you for your time.

12         THE COURT:  All right.  Thank you, Counsel.

13         All right, Ladies and Gentlemen.  Mr. Blackington, you

14   have 27 minutes left, and it's going to take me about 15 to

15   read the final instructions, so if anyone needs to use the

16   restroom, we're going to let you use it back here.  Anybody got

17   to go?  Everybody can sit for 45 more minutes?

18         Okay.  All right, Mr. Blackington.

19         If you want to stand and stretch, feel free to do

20   that.  At least get your backs in order.

21      (Off the record.)

22         MR. BLACKINGTON:  May I, Your Honor?  Are we ready?

23         THE COURT:  You may.

24         MR. BLACKINGTON:  Okay.

25

**<u>CLOSING ARGUMENT BY</u>**:

MR. BLACKINGTON:  Thank you very much, Ladies and
Gentlemen of the Jury.  I appreciate you hanging with us for
the whole length of the trial and this morning.

As the gray hair up here suggests, I've been doing
this for a long time.  I've been a prosecutor for 30 years,
I've done a lot of jury trials, and one of the things I've
noticed in doing these trials is there are several sort of
common strategies that defense lawyers use in their cases, and
I want to discuss with you what some of those strategies are.

The first one is, defense lawyers commonly decide,
you know, there's a lot of evidence against my client, I don't
want my client to be the one on trial, so they try to put the
government witnesses on trial.  Mr. Riggins did that quite a
bit.  He put all of the government's cooperating witnesses on
trial.  Adela Marcelino-Cruz, who he suggested falsified his
identification -- her identification of Chris Tate during the
three controlled buys, and suggested falsified by -- her
testimony by saying maybe it was someone else who showed up.

Let's look at the facts of the case.  Adela
Marcelino-Cruz's testimony doesn't exist on its own.  It was
corroborated by surveillance officers.  Surveillance officers
took videos during some of those controlled buys.  In each of
the buys, they personally identified Chris Tate as being there
for the controlled buys.  And on some of them, they videotaped

1    it and you got to see Chris Tate.

2         The next person they tried -- he tried to put on trial

3    was Danielle Dowling.  The first thing he does is he talks

4    about the great deal she's getting, you know, 188 months in

5    prison, she must think I'm Santa Claus, but the great deal

6    she's getting and how she's lying.  But then he admits, yes,

7    Christopher Tate did do a bunch of drug transactions, and at

8    the end said that her testimony was straightforward.  You can't

9    have it both ways.

10        Lastly, she tried -- he tried to put Tia Dimmett on

11   trial.  And this is the same Tia Dimmett whose boyfriend died

12   on December 20th.  You know, she's got 15 pounds of meth at the

13   house.  And, yeah, she wants to make money and get rid of it.

14   She wasn't trying to blame someone else.  She took

15   accountability for it.  She wanted some money so she could get

16   out of town, so she called the person that she knew sold drugs

17   and conspired with her deceased boyfriend, and did some drug

18   deals with him.

19        So what we see here is, there's an effort to put these

20   government witnesses on trial and create a side show to try to

21   distract from the facts of the case, but it ultimately comes

22   back around.  The facts of the case are that Chris Tate was a

23   big-time methamphetamine dealer, that he was part of a broad

24   conspiracy, and he's guilty of these offenses.

25        Another thing that we see quite often are an effort to

1    sort of make legal concepts too complex, make them seem really

2    complicated.  So the effort is to suggest, then, that because

3    these legal concepts are complicated, a jury can't possibly

4    figure them out and, you know, you might get confused and

5    decide to find these people not guilty.

6         The classic area where defense lawyers try to muddle

7    things up and make things too complex are with the conspiracy

8    charge.  And, Ladies and Gentlemen of the Jury, I talked to you

9    before about the conspiracy charge, and you'll get an

10   instruction.  It will look much like -- it will look like the

11   instruction I have on the screen, instruction number 31.  And

12   it says, "The government must prove each of the following

13   elements beyond a reasonable doubt:  One, the conspiracy, as

14   charged in Count 1, existed."  And you'll get to read the

15   indictment.  And, "Two, the defendant knowingly became a member

16   of a conspiracy with an intent to advance the conspiracy."

17   That's it, that's what a conspiracy is.  That's -- it's that

18   simple, that an agreement to commit a crime existed and each

19   defendant joined the conspiracy with the intent to further it.

20        In an effort to muddle up what a conspiracy is, the

21   defendants -- the defense lawyers talk about the buyer/seller

22   agreement.  And let's talk about what that is.  And I'm looking

23   at jury instruction number 35.  Mr. Thomas put this on the

24   screen.  He also talked about a lot of other things, fronting,

25   looking out for new customers, advising someone on the conduct

1    of business, an agreement to warn about law enforcement, and

2    suggested to you that we had to prove those things to show a

3    conspiracy.

4           Now, Mr. Thomas is right in one regard.  If you can

5    show some of those things, those do tend to show that there's

6    an agreement to commit a crime, but that's not something that

7    we have to prove those four things to distinguish a conspiracy

8    from a buyer/seller agreement.  What we have to prove is the

9    buyer and the seller of the drugs.

10          So let's consider Mr. Tate and somebody else in the

11   conspiracy, Danielle Dowling, for instance; or Chris Tate and

12   Sandra Kellogg; or Sandra Kellogg and Dwyatt Harris, had the

13   joint criminal objective of further distributing controlled

14   substances to others.  In plain English, what we have to prove

15   is a seller/seller agreement.  A buyer/seller agreement, of

16   course, doesn't cut it.  And we've talked about the store where

17   the doughnuts are sold and a customer walks in and buys some

18   doughnuts and leaves.  They're just a buyer.  They're not part

19   of the agreement to sell the doughnuts.

20          In this case -- and to prove a conspiracy, we have to

21   show a seller/seller agreement, that both defendants -- that

22   both people in the conspiracy have agreed to sell drugs.  And

23   one of the ways we show that, and Mr. Thomas used this

24   language, that there's a stake, each person, the seller and the

25   person they're selling to, have a stake in the outcome, a stake

1    in the distribution of drugs.

2         Here we look at the relationship between Chris Tate

3    and Sandra Kellogg.  Chris Tate certainly has a stake in what

4    Sandra Kellogg does.  He's making money off of every drug deal

5    they do.  If he didn't, they're not going to do it; right?

6    He's in the business for money.  So if Sandra Kellogg buys the

7    drugs and doesn't sell them, there's not going to be another

8    drug deal.

9         We heard the testimony that Sandra Kellogg doesn't

10   have a job.  So if she doesn't sell the ounces of meth that

11   she's getting from Chris Tate, she's not going to come back and

12   get more meth.  There is absolutely a stake that Chris Tate has

13   in what Sandra Kellogg does, and that's particularly shown by

14   some -- a couple of text messages in this case, where Sandra

15   Kellogg drives back to Silver Lake after doing a drug deal and

16   Chris Tate texts her to make sure she's safe.

17        Why is Chris Tate concerned about Sandra Kellogg being

18   safe?  Because he has an interest in the drugs that she took

19   back to Silver Lake.  If the police have stopped her, she's not

20   going to be a customer again.  If the drugs don't get back to

21   Silver Lake, she can't sell them and turn around and do another

22   drug deal.  So he absolutely has an interest in what Sandra

23   Kellogg is doing with the drugs.

24        The same way Danielle Dowling testified, that Chris

25   Tate had a stake in what she was doing with the drugs.  If she

1    didn't sell the drugs, the pounds of meth that she was buying

2    from Chris Tate, she couldn't turn around and buy more from

3    Tate, and Tate wouldn't be profiting from their joint venture.

4          Now, one of the things that Mr. Thomas said, that's

5    quite interesting, and I'd like you to take it to heart, he

6    admitted, he told you, yes, Sandra Kellogg and Dwyatt Harris

7    have an agreement to deal drugs, but he suggests to you it's

8    not this conspiracy.  He suggests to you it's something else,

9    and he talks about separate conspiracies.

10         Well, I want you to read the indictment in this case,

11   and I want you to read the "Manner and Means" section of the

12   indictment.  The "Manner and Means" section of the indictment

13   explains how the conspiracy works, and it will talk about what

14   Sandra Kellogg's role in the conspiracy is and what Dwyatt

15   Harris' role in the conspiracy is, specifically that Dwyatt

16   Harris' job was to pick up methamphetamine from Jovan Stewart

17   and others and give them to Sandra Kellogg so that we could --

18   that Kellogg could sell them, that he -- that he was a runner

19   for Sandra Kellogg.  So go ahead and please read the indictment

20   and the "Manner and Means" section, and you will see that that

21   agreement that Mr. Thomas admitted that Kellogg and Harris have

22   is part of the charged conspiracy in this case.

23         Another thing that I don't want to leave out here, in

24   the beginning of his closing argument, Mr. Thomas suggested

25   that I had no business telling you about inferences from the

1    evidence or suggesting how the evidence can be construed.  He

2    was particularly concerned when I asked you to make

3    inference -- an inference or a deduction about how the $375

4    went into Mr. Harris' pants pocket.

5          Now, that doesn't stop him from making inferences.

6    That didn't stop him from saying, "Well, he worked at Jiffy

7    Lube."  You know, the last time I checked, most employers like

8    Jiffy Lube don't hand you a band of cash when you leave work.

9    Your money gets direct deposited.  But he was upset about the

10   inference I asked you to make about where those $375 came from,

11   and particularly that, because we were down from 16 to 11

12   ounces of meth, that one of those ounces or more might have

13   been sold by Mr. Harris.

14         Well, here is what the judge will tell you about

15   inferences.  "Give the evidence whatever weight you feel it

16   deserves.  Use your common sense in weighing the evidence and

17   consider the evidence in light of your own everyday experience.

18   People sometimes look at one fact and conclude from it that

19   another fact exists.  This is called an inference.  You are

20   allowed to make reasonable inferences so long as they are based

21   on the evidence."  So, absolutely, Ladies and Gentlemen of the

22   Jury, feel free to look at the evidence and draw reasonable

23   conclusions on what you see.

24         And this is important in this case, Ladies and

25   Gentlemen of the Jury.  The ability to make inferences, the

1    ability to think, is why you're here.  Back when the founding

2    fathers wrote the constitution and created our judicial system,

3    they had a couple of choices.  You all sit in court, and you've

4    been here for a week and a half, and you've watched Judge

5    Pratt; okay?  All of you, I'm sure, have concluded, as I have

6    for the last 12 years I've practiced in front of her, that

7    she's a terrific judge.  She is.  So you ask the question, why

8    are we here?  Why can't an outstanding judge, like Judge Pratt,

9    simply hear the case and decide if these people are guilty or

10   not?  Why do we have to be here?

11       We're here because of a conscious decision that the

12   founding fathers made.  The founding fathers wanted to bring

13   democracy into the courtroom, but they were faced with a

14   dilemma.  On one hand, you have people like Judge Pratt, who

15   are well educated in the law and understand the law.  So we've

16   got to, on one hand, have someone understand the law.

17       But then there's the question of interpreting facts;

18   okay?  You all, before you walk in the courtroom, may not know

19   what the law is, and that's the purpose of these instructions.

20   Judge Pratt gives you these instructions and tells you what the

21   law is.

22       The founding fathers trust all of you to make

23   reasonable inferences, to think, to use your common sense and

24   apply the law, take the law that Judge Pratt gives you and

25   apply it to the facts in this case.  So, yes, you are allowed

to make reasonable inferences.  You are allowed to listen to these phone calls and interpret them and figure out what's happening.

So at the end of the day, Ladies and Gentlemen of the Jury, I want you to fulfill the duties that the founding fathers have imposed on you.  I want you to go back into the jury room and use your common sense to deliberate in this case and apply the facts to the law.

When you get in the jury room, you'll be given a verdict form, and I have a copy of that verdict form here.  You'll actually get one, two, three, four, five, six stapled verdict forms; okay?  And it's not as -- it's not as high a mountain as it looks.

The first verdict form deals with Count 1, conspiracy to distribute controlled substances.  So it will ask you, with regard to Chris Tate, is he guilty or not guilty?  It will ask you to look at the evidence, all the phone calls you heard, and all the testimony you heard.  Is he guilty of the offense of conspiracy?  Did he agree to commit a crime with someone else?  Did he join an agreement?  And I'd ask you to look at the evidence and check that box that he's guilty.

Then you're given some additional questions.  The first question is, has the government proven, beyond a reasonable doubt, that the conspiracy, as a whole, the conspiracy involved 500 grams or more of a mixture or substance

1    containing meth.  Well over 500 grams alone was seized from

2    Chris Tate's car, so, yes.

3          And then it will instruct you to skip question 2 since

4    you answered yes, and go to question 3.  Did the government

5    prove, beyond a reasonable doubt, that the conspiracy involved

6    50 grams or more of actual methamphetamine?  Again, more than

7    50 grams of actual meth was found in Chris Tate's car, so the

8    answer is yes.

9          The next one will involve Sandra Kellogg, and it will

10   look a lot like Mr. Tate's, the verdict for Count 1 of

11   conspiracy.  Again, how do you find Sandra Kellogg?  Based upon

12   the repeated drug transactions she had, the evidence clearly of

13   her agreement with her boyfriend, Dwyatt Harris, to take the

14   drugs back to Silver Lake and redistribute them, the verdict is

15   guilty.

16         And, again, we're looking at the conspiracy as a

17   whole.  She did move more than 500 grams of meth.  There's, you

18   know, 435 grams in a pound, and if you add up the other ounces,

19   you're over 500.  But you'll be instructed that you look at the

20   weight of the conspiracy as a whole.  So, again, yes, it's over

21   500 grams; and, yes, it's over 50 grams of actual meth.  You

22   have that in her house.

23         Next we look at Count 2, and that's the distribution

24   of methamphetamine during the last of the three controlled buys

25   that Adela Marcelino-Cruz did.  I reminded you about accomplice

1   liability, as well, but you can find, certainly, Christopher

2   Tate took the drugs and gave them to Lacey Guzman, who gave

3   them to Jalisco, who gave them to the informant, Adela.  So you

4   can find the guilt based on either Tate giving the drugs to

5   someone else or aiding and abetting Jalisco and giving the

6   drugs to the informant.  So, yes, verdict of guilty, did it

7   involve 50 grams or more of actual methamphetamine.  The

8   attorneys agreed, in a stipulation, it was over 400 grams of

9   actual meth, so you'll check that box.

10        Next is Count 3, which is possession of

11  methamphetamine with intent to distribute.  And this is the

12  traffic stop from Chris Tate's car.  Now, Mr. Riggins wants you

13  to think that that's Tia Dimmett's drugs; all right?  But

14  here's an instruction that you will get.  It's the instruction

15  dealing with possession, and it's instruction number 46.

16        So let me move the verdict form for a second.

17  Instruction 46, "A person possesses an object if he or she has

18  the ability and intention to exercise direction or control over

19  the object, either directly or through others.  A person may

20  possess an object even if he or she is not in physical contact

21  with it," or, "does not own it."

22        He is exercising -- he took the meth from Tia Dimmett

23  and put it underneath the seat, is the testimony, but he's

24  clearly exercising dominion and control over it and has the

25  ability to do so.  And how do we know that?  He's calling

1    Danielle Dowling and Eric Poore offering to sell them the meth.

2    So he's guilty of possessing that methamphetamine with intent

3    to distribute.

4         And when you go to the second page, you'll be asked if

5    it involved 50 grams or more of actual methamphetamine.  Again,

6    the agreement was the lab tests showed it was over 1,900 grams

7    of actual meth, so I'd ask you to check that box yes.

8         And then the next one you don't have -- you can skip.

9         Next is Count 4, which charges Chris Tate with

10   distributing methamphetamine.  And that's the March 15th deal

11   in Indianapolis, where he gave the pound of methamphetamine to

12   Sandra Kellogg -- or he -- I'm sorry, he had a drug runner do

13   it, so he aided and abetted that drug runner in making the

14   delivery.  He's guilty of it.

15        And, once again, is it over 50 grams or more of actual

16   methamphetamine?  The lab tests showed that the meth at Sandra

17   Kellogg's house, which was just 11 of the 16 ounces, was over

18   like 300 grams of actual meth.  It was like 99 percent pure.

19   So the answer is yes.

20        The last count is Count 5, which is possession with

21   intent to distribute.  Sandra Kellogg possesses drugs in

22   Indianapolis that she got from Tate, the pound of meth, and she

23   intended to distribute it.  Mr. Thomas suggested to you that,

24   well, she intended to distribute it up in Silver Lake, so it

25   didn't matter.

1      I want you to read instruction 45, which talks about

2   the elements of the offense.  And in the elements, did she

3   possess meth, did she intend to distribute it to another

4   person, and did she know that it was a controlled substance?

5   It doesn't indicate where she intended to distribute it.  It's

6   an element, and it isn't an element.  The question is, did she

7   intend to distribute the substance to another person.

8      And that is absolutely the case, Ladies and Gentlemen

9   of the Jury.  When you look at the weight, it's a pound, the

10  fact that she took the drugs back to Silver Lake, and just

11  about three days later there's five ounces of it missing.  What

12  did she do with the five ounces of meth?  What did she and

13  Dwyatt Harris do?  We know there's 375 bucks in Dwyatt Harris'

14  pocket, so there's, again, a reasonable inference about what he

15  did.

16     Did she use five ounces?  Well, what did Danielle

17  Dowling and Desirae Evans tell you?  They use a gram a day.  If

18  you used an ounce, it would kill you.  So she either sold it or

19  the Easter bunny took it, one of the two.  Let's make a

20  reasonable inference on what she did.  And look at how the meth

21  was packaged.  It was packaged for distribution in ounce

22  quantities, and she had the scales and the Baggies in the

23  bedroom with her.

24     So the evidence shows she's guilty, and I'd ask you to

25  check that box.  And the lab results show, that the parties

 1   stipulated to, it was more than 50 grams of actual

 2   methamphetamine.

 3           So I'd ask you, Ladies and Gentlemen of the Jury, to

 4   go back to the jury box (sic) and do what our founding fathers

 5   wanted you to do when they brought democracy into the

 6   courtroom.  Use your good old-fashioned common sense, follow

 7   the law that Judge Pratt gives you, and use your common sense.

 8   And I'm confident that when you do so, you will find all of the

 9   defendants guilty of all of the charges beyond a reasonable

10   doubt.  Thank you very much for your time.

11           THE COURT:  Thank you, Counsel.

12           All right, Ladies and Gentlemen, at this time I'm

13   going to give you your final instructions on the law.  Is

14   everybody okay?

15           Court Reporter, are you okay?

16           THE REPORTER:  Just fine.

17           THE COURT:  All right.  You may follow along on the

18   screen or you can just sit back and listen.

19           Members of the jury, I will now instruct you on the

20   law that you must follow in deciding this case.  I will also

21   give you a copy of these instructions to use in the jury room.

22   You must follow all of my instructions about the law, even if

23   you disagree with them.  This includes the instructions I gave

24   you before the trial, any instructions I gave you during the

25   trial, and any instructions I am giving you now.

1        As jurors, you have two duties.  Your first duty is to

2   decide the facts from the evidence that you saw and heard here

3   in court.  This is your job, not my job or anyone else's job.

4   Your second duty is to take the law as I give it to you, apply

5   it to the facts, and decide if the government has proved each

6   defendant guilty beyond a reasonable doubt.

7        You must perform these duties fairly and impartially.

8   Do not let sympathy, prejudice, fear, or public opinion

9   influence you.  In addition, do not let any person's race,

10  color, religion, national ancestry, or gender influence you.

11  You must not take anything I said or did during the trial as

12  indicating that I have an opinion about the evidence or about

13  what I think your verdict should be.

14       The charges against the defendants are in a document

15  called a second superceding indictment.  You will have a copy

16  of the second superceding indictment during your deliberations.

17       The second superceding indictment in this case

18  charges, in Count 1, that the defendants committed the crime of

19  conspiracy to distribute controlled substances.  Counts 2 and 4

20  charge Defendant Christopher Tate with distribution of

21  methamphetamine.  Count 3 charges Defendant Christopher Tate

22  with possession of methamphetamine with intent to distribute.

23  Count 5 charges Defendant Sandra Kellogg with possession of

24  methamphetamine with intent to distribute.  The defendants have

25  pled not guilty to the charges.

The second superceding indictment is simply the formal way of telling the defendants what crime or crimes they are accused of committing.  It is not evidence that a defendant is guilty.  It does not even raise a suspicion of guilt.

Each defendant is presumed innocent of each and every one of the charges.  This presumption continues throughout the case, including during your deliberations.  It is not overcome unless, from all the evidence in the case, you are convinced beyond a reasonable doubt that the defendant is guilty as charged.

The government has the burden of proving each defendant's guilt beyond a reasonable doubt.  This burden of proof stays with the government throughout the case.  A defendant is never required to prove his or her innocence.  He or she is not required to produce any evidence at all.

You must make your decision based only on the evidence that you saw and heard here in court.  Do not consider anything you may have seen or heard outside of court, including anything from a newspaper, television, radio, the Internet, or any other source.

The evidence includes only what the witnesses said when they were testifying under oath and the exhibits that I allowed into evidence, and the stipulations that the lawyers agreed to.  A stipulation is an agreement that certain facts are true.

1          In addition, you may recall that I took judicial

2     notice of certain facts that may be considered as matters of

3     common knowledge.  You may accept those facts as proved, but

4     you are not required to do so.

5          Nothing else is evidence.  The lawyers' statements and

6     arguments are not evidence.  If what a lawyer said is different

7     from the evidence as you remember it, the evidence is what

8     counts.  The lawyers' questions and objections, likewise, are

9     not evidence.

10         A lawyer has a duty to object if he or she thinks a

11    question is improper.  If I sustained objections to questions

12    the lawyers asked, you must not speculate on what the answers

13    might have been.  If, during the trial, I struck testimony or

14    exhibits from the record or told you to disregard something,

15    you must not consider it.

16         Give the evidence whatever weight you decide it

17    deserves.  Use your common sense in weighing the evidence and

18    consider the evidence in light of your own everyday experience.

19         People sometimes look at one fact and conclude from it

20    that another fact exists.  This is called an inference.  You

21    are allowed to make reasonable inferences so long as they are

22    based on the evidence.

23         You may have heard the terms "direct evidence" and

24    "circumstantial evidence."  Direct evidence is evidence that

25    directly proves a fact.  Circumstantial evidence is evidence

1   that indirectly proves a fact.  You are to consider both direct

2   and circumstantial evidence.  The law does not say that one is

3   better than the other.  It is up to you to decide how much

4   weight to give any evidence, whether direct or circumstantial.

5       Do not make any decisions simply by counting the

6   number of witnesses who testified about a certain point.  What

7   is important is how truthful and accurate the witnesses were

8   and how much weight you think their testimony deserves.

9       The law does not require any party to call as

10  witnesses all persons who may have been present at the time or

11  place involved in the case or who may appear to have some

12  knowledge on the matters at issue in this trial.  Nor does the

13  law require any party to produce as exhibits all papers and

14  things mentioned in the evidence in the case.

15      A defendant has an absolute right not to testify or

16  present evidence.  You may not consider in any way the fact

17  that a defendant did not testify or present evidence.  You

18  should not even discuss it in your deliberations.

19      Part of your job as jurors is to decide how believable

20  each witness was and how much weight to give each witness'

21  testimony.  You may accept all of what a witness says, or part

22  of it, or none of it.  Some factors you may consider include:

23      The intelligence of the witness;

24      The witness' ability and opportunity to see, hear, or

25  know the things the witness testified about;

1          The witness' memory;

2          The witness' demeanor;

3          Whether the witness had any bias, prejudice, or other
4     reason to lie or slant the testimony;

5          The truthfulness and accuracy of the witness'
6     testimony in light of the other evidence presented;

7          And inconsistent or consistent statements or conduct
8     by the witness.

9          It is proper for an attorney to interview any witness
10    in preparation for trial.

11         You have heard testimony from witnesses who were
12    promised a benefit in return for his or her testimony and
13    cooperation with the government, who pled guilty to one of the
14    crimes the defendants are charged with committing.  You may not
15    consider the witness' guilty plea as evidence against the
16    defendants.  You may give these witnesses' testimony whatever
17    weight you believe is appropriate, keeping in mind that you
18    must consider that testimony with caution and great care.

19         You may consider evidence that a witness was convicted
20    of a crime only in deciding the believability of his or her
21    testimony.  You may not consider it for any other purpose.

22         You have heard in witnesses who testified that they
23    were actually involved in criminal conduct charged in the
24    second superceding indictment and some who pled guilty to
25    charges arising out of some of the same facts as in this case.

1    The fact that one or more witnesses have entered into a plea of

2    guilty to one or more of the offenses charged is not evidence

3    of the guilt of any other person, including the defendant.

4         The government is permitted to use accomplice

5    testimony and to enter into agreements with the witnesses to

6    bring the witness' cooperation to the attention of the

7    sentencing court and/or to consider seeking a reduction in the

8    sentencing range for a witness.  The testimony of an accomplice

9    may alone be of sufficient weight to sustain a verdict of

10   guilty if the jury finds the testimony establishes guilt beyond

11   a reasonable doubt.  However, the testimony of an alleged

12   accomplice, someone who said he or she participated in the

13   commission of a crime, must be examined and weighed by the jury

14   with greater care than the testimony of a witness who did not

15   participate in the commission of that crime.

16        You should ask yourself whether the witness would

17   benefit more by lying or by telling the truth.  Was the

18   testimony made up in any way because the witness believed or

19   hoped that he or she would somehow receive favorable treatment

20   by testifying falsely?  Or did he or she believe that his or

21   her interests would best be served by testifying truthfully?

22   If you believe the witness was motivated by personal gain, was

23   the motivation one which would cause the witness to lie, or was

24   it one which would cause the witness to tell the truth?  You

25   are the sole judges of credibility or believability of each

1    witness and the weight to be given to his or her testimony.

2         You have heard testimony of an identification of a

3    person.  Identification testimony is an expression of the

4    witness' belief or impression.  In evaluating this testimony,

5    you should consider the opportunity the witness had to observe

6    the person at the time and to make a reliable identification

7    later.  You should also consider the circumstances under which

8    the witness later made the identification.  The government must

9    prove, beyond a reasonable doubt, that the defendant you are

10   considering is the person who committed the crime that is

11   charged.

12        Identification of a voice, whether heard firsthand or

13   through mechanical or electronic transmission or recording, may

14   be established by opinion based upon hearing the voice at any

15   time under circumstances connecting it with the speaker.

16        You have heard from several witnesses who gave

17   opinions and testimonies concerning drug trafficking practices

18   that he or she examined and analyzed.  You do not have to

19   accept these witnesses' opinions and testimonies.  You should

20   judge these witnesses' opinions and testimonies the same way

21   you judge the testimony of any other witness.

22        In deciding how much weight to give to these opinions

23   and testimonies, you should consider the witnesses'

24   qualifications, how he or she reached his or her opinions and

25   conclusions, and the factors I have described for you

1    determining the believability of testimony.

2           You have heard evidence obtained from the government's

3    use of wiretaps.  The government is permitted to use this

4    technique.  You should consider evidence obtained this way

5    together with and in the same way you consider the other

6    evidence.

7           I instruct you that it is within the proper and lawful

8    performance of the duty of the United States Attorney to enter

9    into plea bargaining with any individual relating to his or her

10   alleged involvement in criminal activity and to make a decision

11   regarding whether or not to present a particular case to the

12   grand jury to seek an indictment, and whether or not to

13   recommend a reduced sentence against a particular individual in

14   exchange for that person's cooperation with the government's

15   investigation.  You should draw no inferences based only on

16   such an exercise of this discretion by the United States

17   Attorney.

18          One who has entered into a plea agreement with the

19   government does not thereby become incompetent as a witness.

20   You may give such testimony the weight you feel it deserves,

21   keeping in mind that it is always to be received with caution

22   and weighed with great care.  Moreover, the witness' agreement

23   to enter a guilty plea is not to be considered as evidence

24   against any defendant.

25          During the trial, English language recordings were

1    admitted into evidence.  This is proper evidence that you

2    should consider together with any -- together with and in the

3    same way you should consider the other evidence.

4           You were also given transcripts of the conversations

5    to help you follow the recordings as you listened to them.  The

6    recordings are the evidence of what was said and who said it.

7    The transcripts are not evidence.  If you noticed any

8    differences between what you heard in a conversation and what

9    you read in the transcripts, your understanding of the

10   recording is what matters.  In other words, you must rely on

11   what you heard, not what you read.  And if you could not hear

12   or understand certain parts of the recording, you must ignore

13   the transcripts as far as those parts are concerned.

14          It is up to you to decide whether to listen to a

15   recording during your deliberations.  You may, if you wish,

16   rely on your recollections of what you heard during the trial.

17   If, during your deliberations, you wish to have another

18   opportunity to listen to a recording, send a written message to

19   the court clerk, and I will provide you with the recording.

20          During the trial, Spanish language recordings were

21   admitted into evidence.  You were also given English

22   transcripts of those recordings so you could consider the

23   contents of recordings.  It is up to you to decide whether a

24   transcript is accurate in whole or in part.  You may consider

25   the translator's knowledge, training, and experience; the

1   nature of the conversation; and the reasonableness of the

2   translation in light of all the evidence in the case.  You may

3   not rely on any knowledge you may have of the Spanish language.

4   Rather, your consideration of the transcript should be based on

5   the evidence introduced in the trial.

6           Certain summaries were admitted in evidence.  You may

7   use those summaries as evidence even though the underlying

8   documents and evidence are not here.

9           Certain maps and charts were shown to you to help

10  explain other evidence that was admitted.  These maps and

11  charts were Exhibit 34.  These maps and charts are not

12  themselves evidence or proof of any facts, so you will not have

13  these particular charts during your deliberations.  If they do

14  not correctly reflect the facts shown by the evidence, you

15  should disregard the maps and charts and determine the facts

16  from the underlying evidence.

17          If you have taken notes during the trial, you may use

18  them during deliberations to help you remember what happened

19  during the trial.  You should use your notes only as aids to

20  your memory.  The notes are not evidence.  All of you should

21  rely on your independent recollection of the evidence and you

22  should not be unduly influenced by the notes of other jurors.

23  Notes are not entitled to any more weight than the memory or

24  impressions of each juror.

25          The second superceding indictment charges that the

1    crimes happened on or about certain dates.  The government must

2    prove that the crimes happened reasonably close to these dates.

3    The government is not required to prove that the crimes

4    happened on those exact dates.

5         The defendants have been accused of more than one

6    crime.  The number of charges is not evidence of guilt and

7    should not influence your decision.  You must consider each

8    charge and the evidence concerning each charge separately.

9    Your decision on one charge, whether it is guilty or not

10   guilty, should not influence your decision on any other charge.

11        Even though the defendants are being tried together,

12   you must consider each defendant and the evidence concerning

13   that defendant separately.  Your decision concerning one

14   defendant, whether it is guilty or not guilty, should not

15   influence your decision concerning any other defendant.

16        In deciding your verdict, you should not consider the

17   possible punishment for the defendants who are on trial.  If

18   you decide that the government has proved a defendant guilty

19   beyond a reasonable doubt, then it will be my job to decide on

20   the appropriate punishment.

21        A person acts knowingly if he realizes what he is

22   doing and is aware of the nature of his conduct and does not

23   act through ignorance, mistake, or accident.  In deciding

24   whether a defendant acted knowingly, you may consider all of

25   the evidence, including what the defendant did or said.

1           A defendant's presence at the scene of a crime and

2   knowledge that a crime is being committed is not sufficient by

3   itself to establish the defendant's guilt.  If a defendant

4   performed acts that advanced the crime, but had no knowledge

5   that the crime was being committed or was about to be

6   committed, those acts are not sufficient by themselves to

7   establish the defendant's guilt.  A defendant's association

8   with persons involved in a crime or criminal scheme is not

9   sufficient by itself to prove his participation in the crime or

10  membership in the criminal scheme.

11          Count 1 of the second superceding indictment charges

12  Defendants Christopher Tate and Sandra Kellogg with a

13  conspiracy to distribute controlled substances.  In order for

14  you to find a defendant guilty of this charge, the government

15  must prove each of the following elements beyond a reasonable

16  doubt:

17              One, the conspiracy, as charged in Count 1, existed;

18              And, two, the defendant knowingly became a member of

19  the conspiracy with an intent to advance the conspiracy.

20          If you find, from your consideration of all the

21  evidence, that the government has proved each of these elements

22  beyond a reasonable doubt, then you should find the defendant

23  you are considering guilty.  If, on the other hand, you find,

24  from your consideration of all the evidence, that the

25  government has failed to prove any one of these elements beyond

1    a reasonable doubt, then you should find the defendant you are
2    considering not guilty.

3            A conspiracy is an express or implied agreement
4    between two or more persons to commit a crime.  A conspiracy
5    may be proven even if its goals were not accomplished.  In
6    deciding whether the charged conspiracy existed, you may
7    consider all of the circumstances, including the words and acts
8    of each of the alleged participants.

9            To be a member of a conspiracy, a defendant need not
10   join it at the beginning and he or she does not need to know
11   all of the other members or all of the means by which the
12   illegal goals of the conspiracy were to be accomplished.  The
13   government must prove, beyond a reasonable doubt, that the
14   defendant you are considering was aware of the illegal goals of
15   the conspiracy and knowingly joined the conspiracy.

16           A defendant is not a member of a conspiracy just
17   because he or she knew and/or associated with people who were
18   involved in the conspiracy, knew there was a conspiracy and/or
19   was present during the conspiratorial discussions.

20           In deciding whether a particular defendant joined the
21   conspiracy charged, you must base your decision only on what
22   that defendant did or said.  To determine what that defendant
23   did or said, you may consider that defendant's own words or
24   acts.  You may also use the words or acts of other persons to
25   help you decide what a defendant did or said.

1       A conspiracy is a combination of two are more persons

2   to accomplish an unlawful purpose or a lawful purpose by

3   unlawful means.  While it involves an agreement to violate the

4   law, it is not necessary that the persons charged met together

5   and entered into an express or formal agreement or that they

6   stated, in words or writing, what the scheme was or how it was

7   to be effected.  It is sufficient to show that they came to a

8   mutual understanding to accomplish an unlawful act.

9       Such an agreement may be inferred from the

10  circumstances and the conduct of the parties since ordinarily a

11  conspiracy is characterized by secrecy.  In determining whether

12  a conspiracy existed, the jury should consider the actions and

13  declarations of all the alleged participants.

14      To be a member of a conspiracy, a defendant need not

15  know all of the other members nor all of the details of the

16  conspiracy, nor the means by which the object was to be

17  accomplished.  Each member of the conspiracy may perform

18  separate and distinct acts.  It is necessary, however, that the

19  government prove, beyond a reasonable doubt, that a defendant

20  was aware of the common purpose and was a willing participant

21  with the intent to advance the purpose of the conspiracy.

22      A conspiracy requires more than just a buyer/seller

23  relationship between a defendant and another person.  In

24  addition, a buyer and seller of controlled substances do not

25  enter into a conspiracy to distribute controlled substances

simply because the buyer resells the controlled substance to others, even if the seller knows that the buyer intends to resell the controlled substance.  To prove a conspiracy, the government must prove that a buyer and seller had the joint criminal objective of distributing controlled substances to others.

That's a lot of reading.  One minute.

Count 1 charges that there was a single conspiracy. The defendant, Sandra Kellogg, contends that there was more than one conspiracy.  If you find that there was more than one conspiracy and that the defendant was a member of one or more of those conspiracies, then you may find the defendant guilty on Count 1 only if the conspiracy of which she was a member was a part of the conspiracy charged in Count 1.

The government is not required to prove the exact conspiracy charged in the second superceding indictment, so long as it proves that the defendant was a member of a smaller conspiracy contained within the charged conspiracy.

You will note that as part of Count 1 of the second superceding indictment, there are charged a number of so-called overt acts.  An overt act is any act knowingly committed by a conspirator in an effort to accomplish some object of the conspiracy.  The overt act need not be criminal in itself, but may be an otherwise innocent act.  It must, however, be an act which follows and tends towards accomplishment of the illegal

1    plan or scheme.

2         In order to show that a defendant conspired to possess

3    and distribute methamphetamine as charged in Count 1, the

4    government need not prove that the particular overt act

5    occurred in furtherance of the conspiracy since the essence of

6    the conspiracy to violate -- since the essence of a conspiracy

7    to violate the Controlled Substances Act is the criminal

8    agreement itself and not the success of the conspirators in

9    carrying out the agreement.

10        Evidence of overt acts charged, however, may tend to

11   establish the continuing nature of the conspiracy and clearly

12   reveal its object.  With respect to Count 1 of the indictment,

13   therefore, the statute does not require an overt act to

14   complete the offense, although the existence of a conspiracy

15   may be inferred from the commission in concert of overt acts by

16   the participants in an alleged conspiracy.

17        The alleged conspiracy was to distribute controlled

18   substances, which is the crime charged in Count 1 of the second

19   superceding indictment, and not the actual unlawful

20   distribution.  In other words, it is immaterial whether or not

21   the purpose of the alleged conspiracy was accomplished.

22        Some of the people who may have been involved in these

23   events are not on trial.  This does not matter.  There is no

24   requirement that all members of a conspiracy be charged and

25   prosecuted or tried together in one proceeding.  Nor is there

1    any requirement that the names of the conspirators be known.

2    An indictment can charge a defendant with a conspiracy

3    involving people whose names are not known as long as the

4    government can prove that the defendant you are considering

5    conspired with one or more of them.

6          If it is established, beyond a reasonable doubt, that

7    a conspiracy existed as charged in Count 1 of the second

8    superceding indictment and that the defendant you are

9    considering was one of its members, then the acts and

10   declarations of any other member of that particular conspiracy

11   in or out of that defendant's presence, done in furtherance of

12   the objects of the conspiracy, and during its existence, may be

13   considered as evidence against that defendant.  When persons

14   enter into an agreement for an unlawful purpose, they become

15   agents for one however.

16         However, statements of any alleged conspirator, which

17   are not in furtherance of the conspiracy, or made before its

18   existence or after its termination, may not be so considered.

19         You are instructed, as a matter of law, that

20   methamphetamine is a Schedule II nonnarcotic controlled

21   substance and that heroin is a Schedule I narcotic controlled

22   substance.

23         In this case, there has been chemical analysis of some

24   of the controlled substances the defendants are charged with

25   possessing with intent to distribute and distributing.  The law

1    is that the introduction of a chemical analysis of the

2    controlled substance at issue is not essential to prove the

3    substances are methamphetamine or heroin, as the testimony of a

4    person who observed the defendant in possession of the

5    controlled substances is sufficient if the person is familiar

6    with the substances at issue.

7         In determining a witness' familiarity with controlled

8    substances at issue here, you may consider the witness'

9    observations, expertise, and the circumstances surrounding the

10   transaction involving the charged controlled substance.

11        Counts 2 and 4 of the second superceding indictment

12   charge Defendant Christopher Tate with distribution of

13   methamphetamine.  In order for you to find the defendant guilty

14   on this charge, the government must prove both of the following

15   elements beyond a reasonable doubt:

16        One, the defendant knowingly distributed

17   methamphetamine;

18        And, two, the defendant knew the substance was or

19   contained some kind of a controlled substance.  The government

20   is not required to prove that the defendant knew the substance

21   was methamphetamine.

22        If you find, from your consideration of all the

23   evidence, that the government has proved each of these elements

24   beyond a reasonable doubt as to the charge you are considering,

25   then you should find the defendant guilty of that charge.

1        If, on the other hand, you find, from your

2   consideration of all the evidence, that the government has

3   failed to prove any one of these elements beyond a reasonable

4   doubt as to the charge you are considering, then you should

5   find the defendant not guilty of that charge.

6        A person distributes a controlled substance if he or

7   she delivers or transfers possession of the controlled

8   substance to someone else or causes a person to deliver or

9   transfer possession of the controlled substance to another

10  person.

11       A person who aids in the commission of an offense may

12  be found guilty of that offense if he or she knowingly

13  participated in the criminal activity and tried to make it

14  succeed.

15       Count 3 of the second superceding indictment charges

16  Defendant Christopher Tate with possession of methamphetamine

17  with intent to distribute.  Count 5 of the second superceding

18  indictment charges Defendant Sandra Kellogg with possession of

19  methamphetamine with intent to distribute.

20       In order for you to find the defendant guilty of this

21  charge, the defendant must prove both of the following elements

22  beyond a reasonable doubt:

23       One, the defendant knowingly possessed

24  methamphetamine;

25       Two, the defendant intended to distribute the

1   substance to another person;

2         And, three, the defendant knew the substance was some

3   kind of a controlled substance.  The government is not required

4   to prove that the defendant knew the substance was

5   methamphetamine.

6         If you find, from your consideration of all the

7   evidence, that the government has proved each of these elements

8   beyond a reasonable doubt as to the charge you are considering,

9   then you should find the defendant you are considering guilty

10  of that charge.

11        If, on the other hand, you find, from your

12  consideration of all the evidence, that the government has

13  failed to prove any one of these elements beyond a reasonable

14  doubt as to the charge you are considering, then you should

15  find the defendant you are considering not guilty of that

16  charge.

17        A person possesses an object if he or she has the

18  ability and intention to exercise direction or control over the

19  object, either directly or through others.  A person may

20  possess an object even if he or she is not in physical contact

21  with it and even if he or she does not own it.

22        More than one person may possess an object.  If two or

23  more persons share possession, that is called "joint

24  possession."  If only one person possesses the object, that is

25  called "sole possession."  The term "possess" in these

1    instructions includes both joint and sole possession.

2         In attempting to determine the intent of any person,

3    you may take into consideration all the facts and circumstances

4    shown by the evidence received in the case.  In determining a

5    person's intent to distribute controlled substances, you may

6    consider, among other things, the quantity of the controlled

7    substance.  Proof of possession of a substantial amount of

8    methamphetamine supports the inference that the possessor

9    intended to distribute the drugs rather than retain them for

10   personal use.

11        If you find a defendant guilty of the offense charged

12   in Count 1 of the second superceding indictment, you must then

13   determine the amount of controlled substances the government

14   has proven was involved in the offense.  You will see on the

15   verdict form a question concerning the amount of

16   methamphetamine involved in the offense charged in Count 1 of

17   the second superceding indictment.  You should consider this

18   question only if you have found that the government has proven

19   the defendant you are considering guilty of the offense charged

20   in Count 1 of the second superceding indictment.

21        If you find the government that is proven, beyond a

22   reasonable doubt, that the offense involved 500 grams or more

23   of a mixture or substance containing a detectable amount of

24   methamphetamine, then you should answer the first question yes.

25   If you answer yes, then you need not answer the remaining

1    questions regarding drug quantity for that count.

2         If you find that the government has not proven, beyond

3    a reasonable doubt, that the offense involved 500 grams or more

4    of a mixture or substance containing a detectable amount of

5    methamphetamine, then you should answer the first question no.

6    If you answer the first question no, then you must answer the

7    next question.

8         That question asks you to determine whether the

9    government has proven, beyond a reasonable doubt, that the

10   offense involved 50 grams or more of a mixture or substance

11   containing a detectable amount of methamphetamine.  If you find

12   that the government has proven, beyond a reasonable doubt, that

13   the offense involved 50 grams or more of a mixture or substance

14   containing a detectable amount of methamphetamine, then you

15   should answer the second question yes.  If you find that the

16   government has not proven, beyond a reasonable doubt, that the

17   offense involved 50 grams or more of a mixture or substance

18   containing a detectable amount of methamphetamine, then you

19   should answer the second question no.

20        When determining the amount of the mixture or

21   substance containing a detectable amount of methamphetamine

22   attributable to the conspiracy, the focus is on whether the

23   overall conspiracy involved the distribution of in excess of

24   500 grams of a mixture or substance containing a detectable

25   amount of methamphetamine, and not on the individual members of

1    the conspiracy.  As a member of the conspiracy, each is

2    accountable for the acts of all other conspirators within the

3    scope of that agreement.

4         If you find Christopher Tate guilty of the offense

5    charged in Counts 2 or 3 or 4 of the second superceding

6    indictment, you must then determine the amount of

7    methamphetamine the government has proven was involved in the

8    offense.

9         You will see on the verdict form a question concerning

10   the amount of methamphetamine involved in the offense charged

11   in Counts 2 or 3 or 4 of the second superceding indictment.

12   You should consider this question only if you have found that

13   the government has proven the defendant guilty of that offense

14   charged in Count 2 or 3 or 4 of the second superceding

15   indictment.

16        If you find that the government has proven, beyond a

17   reasonable doubt, that the offense involved 50 grams or more of

18   actual methamphetamine, then you should answer the first

19   question yes.  If you answered yes, then you need not answer

20   the remaining questions regarding drug quantity for that count.

21        If you find that the government has not proven, beyond

22   a reasonable doubt, that the offense involved 50 grams or more

23   of actual methamphetamine, then you should answer the first

24   question no.  If you answered the first question no, then you

25   must answer the next question.  That question asks you to

1   determine whether the government has proven, beyond a

2   reasonable doubt, that the offense involved five grams or more

3   of actual methamphetamine.

4           If you find that the government has proven, beyond a

5   reasonable doubt, that the offense involved five grams or more

6   of actual methamphetamine, then you should answer the

7   second question yes.  If you find that the government has not

8   proven, beyond a reasonable doubt, that the offense involved

9   five grams or more of actual methamphetamine, then you should

10  answer the second question no.

11          If you find Sandra Kellogg guilty of the offense

12  charged in Count 5 of the second superceding indictment, you

13  must then determine the amount of methamphetamine the

14  government has proven was involved in the offense.

15          You will see on the verdict form a question concerning

16  the amount of methamphetamine involved in the offense charged

17  in Count 2 of the second superceding indictment.  You should

18  consider this question only if you have found that the

19  government has proven the defendant guilty of the offense

20  charged in -- this should be Count 5, shouldn't it?

21          MR. BLACKINGTON:  Yes, Your Honor.

22          THE COURT:  Count 5.  We'll correct that.  I'll

23  repeat.

24          You will see on the verdict form a question concerning

25  the amount of methamphetamine involved in the offense charged

1    in Count 5 of the second superceding indictment.  You should

2    consider this question only if you have found that the

3    government has proven the defendant guilty of the offense

4    charged in Count 5 of the second superceding indictment.

5         If you find that the government has proven, beyond a

6    reasonable doubt, that the offense involved 50 grams or more of

7    actual methamphetamine, then you should answer the first

8    question yes.  If you answered yes, then you need not answer

9    the remaining questions regarding drug quantity for that count.

10        If you find that the government has not proven, beyond

11   a reasonable doubt, that the offense involved 50 grams or more

12   of actual methamphetamine, then you should answer the first

13   question no.  If you answer the first question no, then you

14   must answer the next question.  The question -- that question

15   asks you to consider whether the government has proven, beyond

16   a reasonable doubt, that the offense involved -- it should --

17   is that five grams?

18        MR. BLACKINGTON:  Yes, Your Honor.

19        THE COURT:  -- five grams or more of actual

20   methamphetamine.

21        If you find that the government has proven, beyond a

22   reasonable doubt, that the offense involved five grams or more

23   of actual methamphetamine, then you should answer the second

24   question yes.  If you find that the government has not proven,

25   beyond a reasonable doubt, that the offense involved five grams

1    or more of actual methamphetamine, then you should answer the

2    second question no.

3           Once you are all in the jury room, the first thing you

4    should do is choose a foreperson.  The foreperson should see to

5    it that your deliberations are carried on in an organized way

6    and that everyone has a fair chance to be heard.  You may

7    discuss the case only when all jurors are present.

8           Once you start deliberating, do not communicate about

9    the case or your deliberations with anyone except other members

10   of the jury.  You may not communicate with others about the

11   case or deliberations by any means.  This includes oral or

12   written communication, as well as any electronic method of

13   communications, such as a telephone, cell phone, smartphone,

14   iPhone, BlackBerry -- I don't know where you would find one --

15   computer, text message, any instant messaging, the Internet,

16   chatrooms, blogs, Web sites, and social media services like

17   Facebook, Myspace, LinkedIn, YouTube, Pinterest, Instagram,

18   Twitter, or any other method of communication.

19          If you need to communicate with me while you are

20   deliberating, send a note through the court clerk.  The note

21   should be signed by the foreperson or by one or more members of

22   the jury.  You have a -- to have a complete record of this

23   trial, it is important that you do not communicate with me

24   except by a written note.  I may have to talk with the lawyers

25   about your message, so it may take some time for me to get back

1    to you.  You may continue your deliberations while you wait for

2    my answer.

3            Please be advised that transcripts of trial testimony

4    are not available to you.  You must rely on your collective

5    memory of the testimony.  If you send me a message, do not

6    include any breakdown of your -- of any votes you may have

7    conducted.  In other words, do not tell me that you are split

8    6-6 or 8-4 or whatever your vote happens to be.

9            Alternate jurors, you are not allowed to

10   participate in deliberations or render a vote on the verdict

11   unless you are called upon to replace a member of the 12-person

12   panel.  Any replacement will be done in open court and on the

13   record.

14           Verdict forms have been prepared for you.  You will

15   take these forms with you to the jury room.  When you have

16   reached unanimous agreement, your foreperson will fill in,

17   date, and sign the appropriate verdict forms.  Advise the Court

18   clerk once you have reached your verdict.  When you come back

19   to the courtroom, the verdicts will be read aloud.

20           Your verdict must represent the considered judgment of

21   each juror.  Your verdict, whether it is guilty or not guilty,

22   must be unanimous.  You should make every reasonable effort to

23   reach a verdict.  In doing so, you should consult with each

24   other, express your own views, and listen to your fellow

25   jurors' opinions.  Discuss your differences with an open mind.

1    Do not hesitate to reexamine your own view and to change your

2    opinion if you come to believe it is wrong.  But you should not

3    surrender your honest beliefs about the weight or effect of

4    evidence just because of the opinions of your fellow jurors or

5    just so that there can be a unanimous verdict.

6          The 12 of you should give fair and equal consideration

7    to all the evidence.  You should deliberate with the goal of

8    reaching an agreement that is consistent with the individual

9    judgment of each juror.  You are impartial judges of the facts.

10   Your sole interest is to determine whether the government has

11   proved its case beyond a reasonable doubt.

12         So at this time I need my bailiffs to come forward.

13   Claunick?

14         And if you would raise your right hands.

15     (The bailiffs are sworn.)

16       THE COURT:  Ladies and Gentlemen of the Jury, you may

17   now retire for your deliberations.  Tanesa is going to take the

18   alternates down to get your things and then we're going to

19   bring you back up here and you're going to get to stay in my

20   nice, comfortable jury room.

21         All right, Tanesa.

22       THE COURTROOM DEPUTY:  All rise.

23       THE COURT:  Oh, you're allowed to take your binders

24   with you.  Take all your materials with you, Ladies and

25   Gentlemen.  If anyone needs assistance -- if anyone can't get

1    down -- needs assistance, Tanesa does have a cart.

2          Okay.  Some people might not want to carry those

3    binders.  Everybody take all your things.  Do you have -- do

4    you all have things downstairs?  Okay.  Go down and get your

5    things and then she'll bring them back up.  Your lunch is also

6    there waiting for you.

7          (Jury out at 1:58.)

8          MR. BLACKINGTON:  Excuse me, Your Honor.  I had a

9    quick question.

10         THE COURT:  Sure.  Let's let them get that door

11   closed.

12         MR. BLACKINGTON:  Sure.

13         THE COURT:  Okay.

14         MR. BLACKINGTON:  Were you going to pull out the two

15   alternates now?

16         THE COURT:  Yes.  They went to get -- they left their

17   things downstairs.

18         MR. BLACKINGTON:  Okay.

19         THE COURT:  And she's going to bring them back.  And

20   they're going to be right here in the jury room; okay?  So

21   they'll be right up here with us.

22         All right.  And we're going to make those corrections

23   on 51 to make sure that says "Count 5."

24         All right, lawyers, make sure Tanesa has your cell

25   phone numbers, and we'll give you a call.

1        We are in recess.  You can take him down.

2        A DEPUTY U.S. MARSHAL:  Yes, Your Honor.

3    (Recess at 2:00, until 5:45.)

4        THE COURT:  We are on the record.  This is the United

5    States of America versus Christopher Tate and Sandra Kellogg.

6        And, Counsel, the bailiff advises the Court that the

7    jury has reached a verdict.  Before we entertain the verdict,

8    there were two questions from the jury, questions and

9    inquiries.

10        The first question was:  "For Count 1, does conspiracy

11   need to be between Tate and Kellogg?  Or is it conspiracy

12   between Tate and anyone and/or Kellogg and anyone?"  After

13   consulting with all counsel, we agreed that the response would

14   be, "The law is that each defendant has to join in the

15   conspiracy as charged in Count 1 of the superceding

16   indictment."

17        Do you agree, Mr. Blackington?

18        MR. BLACKINGTON:  Yes, Your Honor.

19        THE COURT:  Mr. Riggins?

20        MR. RIGGINS:  Yes, Your Honor.

21        THE COURT:  And, Mr. Thomas?

22        MR. THOMAS:  Yes, Your Honor.

23        THE COURT:  The second inquiry was -- it says,

24   "Paperwork for Count 3, page 2, after question one, if you've

25   answered yes, it refers to the wrong numbered question.  Do we

1    complete it as is or await a corrected version?"  And the

2    Court, after consulting with counsel, the response is, "Our

3    apologies.  Here is the corrected version of the verdict form

4    for Count 3."

5               Do you agree, Government?

6               MR. BLACKINGTON:  Yes, I do, Your Honor.

7               THE COURT:  Mr. Riggins?

8               MR. RIGGINS:  Yes, Your Honor.

9               THE COURT:  And, Mr. Thomas?

10              MR. THOMAS:  Yes, Your Honor.

11              THE COURT:  And we did take back a -- Tanesa gave them

12   a corrected verdict form for Count 3.

13              All right, Government, are you ready for the jury?

14              MR. BLACKINGTON:  Yes, Your Honor.

15              THE COURT:  Mr. Riggins?

16              MR. RIGGINS:  Yes, Your Honor.

17              THE COURT:  And, Mr. Thomas?

18              MR. THOMAS:  I am also ready, Your Honor.

19              THE COURT:  All right.  Tanesa, you can bring in the

20   panel.

21              And the Court wants to admonish -- I know there are

22   about ten people in the overflow room, watching.  The Court is

23   going to admonish those persons that, regardless of whether

24   you're happy or sad about the verdict, there will be no

25   outbursts in the courthouse.  And for the defendants in the

1  courtroom, whether you're happy or sad about the verdict, no

2  outbursts in the courtroom.

3          Do you agree, Mr. Tate?

4          DEFENDANT TATE:  Yes, ma'am.

5          THE COURT:  And do you agree, Ms. Kellogg?

6          DEFENDANT KELLOGG:  Yes, ma'am.

7          THE COURT:  Okay.  Thank you.

8      (Off the record.)

9          THE COURTROOM DEPUTY:  All rise.

10     (Jury in at 5:51.)

11         THE COURT:  We are on the record.  This is the United

12  States of America versus Christopher Tate and Sandra Kellogg.

13  Mr. Tate appears in person and with his attorney, Kenneth

14  Lawrence Riggins.  Ms. Kellogg appears in person with her

15  attorney, Ross G. Thomas.  The United States of America is

16  represented by Assistant United States Attorney Bradley A.

17  Blackington.

18         And, Counsel, the bailiff advises the Court that the

19  jury has reached a verdict.

20         And, let's see, who's holding the paperwork?  Sir, are

21  you the foreperson?

22         JUROR:  Yes.

23         THE COURT:  And has the jury reached a verdict?

24         JUROR:  We have.

25         THE COURT:  Would you please hand the form of the

Vol. 7-1384

1    verdicts to the bailiff.

2           Thank you.

3           The United States of America versus Christopher Tate.

4    Count 1, conspiracy to distribute controlled substances.  With

5    respect to the charge of conspiracy to distribute controlled

6    substances, in violation of Title 21 United States Code,

7    Section 846, as described in Count 1 of the second superceding

8    indictment, we, the jury, unanimously find the defendant,

9    Christopher Tate, guilty.

10          With respect to Count 1, we, the jury, find that the

11   government has proven, beyond a reasonable doubt, that the

12   conspiracy to distribute methamphetamine involved 500 grams or

13   more of a mixture or substance containing a detectable amount

14   of methamphetamine, yes.

15          With respect to Count 1, we, the jury, find that the

16   government has proven, beyond a reasonable doubt, that the

17   conspiracy to distribute methamphetamine involved 50 grams or

18   more of actual methamphetamine, yes.

19          Signed by the foreperson, dated February 15th, 2022.

20          Count 2, distribution of methamphetamine.  With

21   respect to the charge of distribution of methamphetamine, in

22   violation of Title 21 United States Code, Section 841(a)(1),

23   as described in Count 2 of the second superceding indictment,

24   we, the jury, unanimously find the defendant, Christopher Tate,

25   guilty.

1         With respect to Count 2, we, the jury, find that the

2    government has proven, beyond a reasonable doubt, that the

3    amount of methamphetamine distributed involved 50 grams or more

4    of actual methamphetamine, yes.

5         Dated February 15th, 2022, signed by the foreperson.

6         Count 3, possession of methamphetamine with intent to

7    distribute.  With respect to the charge of possession of

8    methamphetamine with the intent to distribute, in violation of

9    Title 21 United States Code, Section 841(a)(1), as described

10   in Count 3 of the second superceding indictment, we, the jury,

11   unanimously find the defendant, Christopher Tate, guilty.

12        With respect to Count 3, we, the jury, find that the

13   government has proven, beyond a reasonable doubt, that the

14   amount of methamphetamine that was possessed with the intent to

15   distribute involved 50 grams or more of actual methamphetamine,

16   yes.

17        Dated February 15, 2022, signed by the foreperson.

18        Count 4, distribution of methamphetamine.  With

19   respect to the charge of distribution of methamphetamine, in

20   violation of Title 21 United States Code, Section 841(a)(1), as

21   described in Count 4 of the second superceding indictment, we,

22   the jury, unanimously find the defendant, Christopher Tate,

23   guilty.

24        With respect to Count 4, we, the jury, find that the

25   government has proven, beyond a reasonable doubt, that the

1  amount of methamphetamine distributed involves 50 grams or more

2  of actual methamphetamine, yes.

3          Dated February 15th, 2022, signed by the foreperson.

4          The United States of America versus Sandra Kellogg.

5  Count 1, conspiracy to distribute controlled substances.  With

6  respect to the charge of conspiracy to distribute controlled

7  substances, in violation of Title 21 United States Code,

8  Section 846, as described in Count 1 of the second superceding

9  indictment, we, the jury, unanimously find the defendant,

10  Sandra Kellogg, guilty.

11          With respect to Count 1, we, the jury, find that the

12  government has proven, beyond a reasonable doubt, that the

13  conspiracy to distribute methamphetamine involved 500 grams or

14  more of a mixture or substance containing a detectable amount

15  of methamphetamine, yes.

16          Dated February 15th, 2022, signed by the foreperson.

17          Count 5, possession of methamphetamine with intent to

18  distribute.  With respect to the charge of possession of

19  methamphetamine with intent to distribute, in violation of

20  Title 21 United States Code, Section 841(a)(1), as described in

21  Count 5 of the second superceding indictment, we, the jury,

22  unanimously find the defendant, Sandra Kellogg, guilty.

23          With respect to Count 5, we, the jury, find that the

24  government has proven, beyond a reasonable doubt, that the

25  amount of methamphetamine that was possessed with intent to

1    distribute involved 50 grams or more of actual methamphetamine,

2    yes.

3              Dated February 15th, 2022, signed by the foreperson.

4              And, Ladies and Gentlemen, the Court is going to poll

5    the jury, and we're going to call juror number one the person

6    seated in the very front closest to me.

7              Juror number one, are those your verdicts?

8              JUROR:  Yes.

9              THE COURT:  Juror number 2?

10             JUROR:  Yes.

11             THE COURT:  Juror number 3?

12             JUROR:  Yes.

13             THE COURT:  In the first row in the box, juror number

14    4?

15             JUROR:  Yes.

16             THE COURT:  Juror number 5?

17             JUROR:  Yes.

18             THE COURT:  Juror number 6?

19             JUROR:  Yes.

20             THE COURT:  Juror number 7?

21             JUROR:  Yes.

22             THE COURT:  Juror number 8?

23             JUROR:  Yes.

24             THE COURT:  Juror number 9?

25             JUROR:  Yes.

1    THE COURT:  Juror number 10?

2    JUROR:  Yes.

3    THE COURT:  Juror number 11?

4    JUROR:  Yes.

5    THE COURT:  And juror number 12?

6    JUROR:  Yes.

7    THE COURT:  All right, Ladies and Gentlemen of the

8  Jury, on behalf of the citizens of the United States District

9  Court in the Southern District of Indiana and the attorneys and

10  all of the parties, I would like to thank you all for your

11  seven days of very diligent jury service.  You have performed a

12  very important civic duty, and we all appreciate you taking the

13  time and the effort to do what you've done.  It's a very

14  important function.

15    I'm going to send you back to your jury room with

16  Tanesa, and I will come down and speak to you all before you

17  leave.  So thank you again.

18    THE COURTROOM DEPUTY:  All rise.

19    (Jury out at 5:59.)

20    THE COURT:  Lawyers and defendants, the Court is

21  going to go ahead and enter the preliminary judgments of

22  conviction.

23    Ms. Kellogg, because you have now been convicted,

24  under statute, the Court is required to take you into custody.

25  I think you've been previously advised it was the Court's

1    intent.  So I'm going to remand you to the custody of the

2    United States Marshal.

3          I'm going to order a Presentence Investigation Report.

4    Someone from the United States Probation Office is going to

5    contact your attorneys, and they will schedule a time to talk

6    to you.  And the Court -- they will prepare a report about you

7    that will assist the Court in determining what sentence to

8    impose, and your attorneys are allowed to be present when you

9    do those interviews.

10          With respect to the enhancements on Mr. Tate, how do

11    you propose that we proceed with those, Counsel?

12          MR. BLACKINGTON:  Your Honor, I think that's an issue

13    that should be raised at sentencing if the defense contests the

14    enhancement.  You know, I think that's something that just

15    plays out in the sentencing hearing.  We agreed in the

16    stipulation that the government had the burden of proving them

17    at sentencing beyond a reasonable doubt.  I still think that's

18    our burden.  It's just that we prove it to the Court.

19          THE COURT:  Okay.  Do you agree, Mr. Riggins?

20          MR. RIGGINS:  Yes, Your Honor.  That's what we agreed

21    to.

22          THE COURT:  Okay.  All right.  So we're going to --

23    I'm going to discharge the jury.  And thank you, lawyers.  You

24    all did a fine job.

25          MR. BLACKINGTON:  Thank you, Your Honor.

Vol. 7-1390

 1          THE COURT:  All right.  I'll see everybody as soon as

 2     the Presentence Report is prepared.  We are adjourned.

 3          COURT CLERK:  All rise.

 4     (Proceedings adjourned at 6:01 p.m.)

 5

 6     ----------------------------------------------------------

 7

 8              CERTIFICATE OF COURT REPORTER

 9

10

11       I, David W. Moxley, hereby certify that the

12     foregoing is a true and correct copy of the

13     transcript originally filed with the clerk of court

14     on July 27, 2022, and incorporating redactions of

15     personal identifiers requested by the following

16     attorney of record: Bradley A. Blackington, in

17     accordance with Judicial Conference.  Redacted

18     characters appear as blacked out in the transcript.

19

20

21

22     /S/ David W. Moxley                October 26, 2022

23     DAVID W. MOXLEY, RMR/CRR/CMRS
       Official Court Reporter
24     Southern District of Indiana
       Indianapolis Division
25